690 A.2d 712

TEMPLE UNIVERSITY OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION, Appellee,

v.

ALLEGHENY HEALTH EDUCATION AND RESEARCH FOUNDATION and St. Christopher'S Hospital for Children, Appellants.

Superior Court of Pennsylvania.

Argued Oct. 2, 1996.

Filed Jan. 22, 1997.

Richard Sprague, Philadelphia, for appellants.

Mark A. Aronchick, Philadelphia, for Temple University, appellee.

Before McEWEN, President Judge, and EAKIN and HOFFMAN, JJ.

McEWEN, President Judge:

We here address an appeal from an order which (1) granted the petition of Temple University (hereinafter "Temple" or appellee) for a temporary restraining order and temporary injunction against Allegheny Health Education and Research Foundation (hereinafter "AHERF") and St. Christopher's Hospital for Children (hereinafter "SCHC"), the two defendants in the underlying action who will for the purpose of this discussion be designated *appellant*, and (2) directed that, *inter alia*, AHERF and SCHC rescind their purported termination

of agreements into which they had entered with Temple. While the scrutiny of the record by the majority reveals the exemplary patience and insight of the trial judge throughout the extended and vexing proceedings, we are obliged to reverse the order and remand the case to the trial court.

The factual history underlying this litigation can best be supplied by reference to the contracts underlying the relationship between the parties, since the issues presented by this appeal arise from three agreements into which the parties have entered:

A 1990 Affiliation Agreement which formalized a prior relationship and affiliation between the parties, entered into on March 23, 1990.

A Sub–Lease Agreement entered into on that same date, March 23, 1990, which called for appellant to lease to Temple specified areas of the facility and for Temple to pay a monthly rental sum.

A second Affiliation Agreement entered into by the parties on June 14, 1994, which superseded the earlier Affiliation Agreement of March 23, 1990.

The 1990 Sub–Lease Agreement called for Temple to pay an annual rental in 12 equal installments on the first day of each month, at a designated location, more specifically:

2.1. *Annual Rent.* During the term of this Lease, Tenant [Temple] covenants and agrees to pay to Landlord [St. Christopher's] without demand a first year annual rent ("Base Year Rent") equal to Two Million One Hundred Fourteen Thousand Four Hundred Fifty One Dollars ($2,114,451) application to the whole of the Demised Premises, subject to the annual increases in Base Year Rent specified in Paragraph 2.2 hereof. Payment of the Base Year Rent shall be made in twelve equal monthly installments.... Payment of each installment shall be made on the first day of each month, without prior notice or demand, at 100 W. Laurel Avenue, Cheltenham, Pennsylvania 19012.

That 1990 Sub–Lease Agreement conferred upon Temple the right to cure any default in the payment of rent within 15 days

of the default, and extended to appellant the prerogative to terminate the Sub–Lease Agreement in the event of the failure of Temple to cure such a monetary default as the payment of rent, the specific provisions of which follow:

13.1. *Default, Notice, Termination.* If Tenant defaults in the payment of rent or additional rent or defaults in the performance of any of the terms, covenants, or conditions of this Lease, Landlord may give to Tenant written notice of such default, and if Tenant does not cure any monetary default within fifteen (15) days, or other default within thirty (30) days, after the giving of such notice (or, if such other non-monetary default is of such nature that it cannot be completely cured within such thirty (30) days, if Tenant does not commence such curing within such thirty (30) days and thereafter proceed with reasonable diligence and in good faith to cure such default), the Landlord may terminate this Lease on not less than seven (7) days written notice to Tenant, and on the date specified in said notice the term of this Lease shall terminate, and Tenant shall then quit and surrender the Demised Premises to Landlord, but Tenant shall remain liable as hereinafter provided. If this Lease shall have been so terminated by Landlord, Landlord may at any time thereafter resume possession of the Demised Premises by any lawful means and remove Tenant and other occupants and their effects.

That Sub–Lease Agreement was also designated as a *no waiver agreement* by the following provision:

18.1 *No Waiver.* The failure of either party to insist on strict performance of any term, covenant, or condition hereof, or to exercise any option herein contained, shall not be construed as a waiver of such term, covenant, condition, or option in any other instance.

The 1990 Affiliation Agreement, executed contemporaneously with that Sub–Lease Agreement, provided:

That appellant would make monthly AS&T services (Administration, Supervision, and Teaching services) payments to Temple, and

That Temple could *offset* a monthly rental sum which the Sub–Lease Agreement called for Temple to pay to St. Christopher's against what would always be the greater sum which St. Christopher's was obliged to pay Temple for AS&T services.

When the parties replaced the 1990 Affiliation Agreement with the new Affiliation Agreement of June 14, 1994, the Sub–Lease Agreement of 1990 remained intact. The 1994 Affiliation Agreement (1) once again obliged appellant to provide for AS&T services payments, (2) but restructured the method of the payment for those AS&T services, and (3) failed to extend to Temple the right to offset monthly rental payments which the Sub–Lease Agreement obliged Temple to make to St. Christopher's pursuant to Paragraph 2.1 of the Sub–Lease Agreement.

The parties, however much the June 14, 1994, Affiliation Agreement might have altered their rights and duties, continued until the end of 1994, the prior practice which saw appellant make estimated monthly AS&T payments to Temple after calculation of the offset or rental sum due from Temple to appellant. Appellant halted in December, 1994, its monthly AS&T payments to Temple, and subsequently called upon Temple to pay to it the monthly rental sum due under the Sub–Lease Agreement of 1990. When Temple failed to do so, appellant, on October 11, 1995, declared Temple in monetary default, and, when Temple failed to cure the declared default, appellant on November 1, 1995, declared the termination of both

The Sub–Lease Agreement of 1990, and

The 1994 Affiliation Agreement, pursuant to paragraph 18 of that 1994 Affiliation Agreement, specifically:

18. [Temple] and [St. Christopher's] are parties to a lease agreement entered into between United Hospitals, Inc. and Temple University dated March 23, 1990 (the "Lease Agreement"), which shall continue in effect through the term of this Agreement. The Lease Agreement and this Agreement shall each be subject to the other; the termination of one shall constitute immediate termination of the other.

Temple commenced the instant litigation promptly thereafter and secured the entry of a temporary restraining order on November 17, 1995. When the trial court, following several days of hearings, granted the application of appellee for a preliminary injunction and, *inter alia,* directed rescission of the termination declarations, appellant undertook the instant appeal.

The principles of law which guide our consideration are rather elementary, however enormous the impact upon the parties, and have, as appellee acknowledges, been correctly presented by appellant:

"The interpretation of a contract is a question of law". *Halpin v. LaSalle University,* 432 Pa.Super. 476, 481, 639 A.2d 37, 39 (1994), *allo. denied,* 542 Pa. 670, 668 A.2d 1133 (1995).

"It is well established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and *when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement.* As this Court stated in *East Crossroads Center, Inc. v. Mellon–Stuart Co.,* 416 Pa. at 230–231, 205 A.2d at 866, *'[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence.'* " *Steuart v. McChesney,* 498 Pa. 45, 48–49, 444 A.2d 659, 661 (1982) (emphasis added) (citations omitted).

The particular issue for special scrutiny is whether the terms of the 1994 Affiliation Agreement between the parties reflect such ambiguity as to require the admission of extrinsic evidence such as: the intention of the parties, the motive of appellant, the practices in which the parties engaged under the prior agreement, and the conduct of, as well as the procedures in which, appellant engaged during the months following execution of the 1994 contract. If the 1994 Affiliation Agreement is ambiguous, it follows (1) that the trial court

properly admitted the extrinsic evidence, and (2) the extrinsic evidence so supplements the 1994 Affiliation Agreement as to preclude the termination by appellant of that 1994 Affiliation Agreement and the 1990 Sub–Lease Agreement, and thereby the declaration by appellant of breach and default by appellee. If, on the other hand, the provisions of the 1994 Affiliation Agreement are not ambiguous, the proffered extrinsic evidence is not admissible, and the courts are precluded from complementing the explicit terms of the agreements between the parties and from interference with the declaration by appellant of breach and default on the part of appellee.

Our study compels the conclusion that the provisions of the 1994 Affiliation Agreement are so tight, clear, and certain as to preclude the admission of such extrinsic evidence, and that, therefore, the trial court erred as a matter of law when it ruled to the contrary.

■ The focus of the ambiguity argument of appellees is paragraph 11 of the 1994 Affiliation Agreement which states:

AS&T: For years beginning with FY 1995, SCHC and [Temple] will negotiate AS&T levels based on actual time and effort of TUSM faculty at SCHC, including of MCP and Hahnemann University students. For FY 1995 and 1996, the net payment will be not less than the FY94 level. For FY97, if the amount negotiated is less than the FY96 level, then the amount that SCHC will be required to pay for FY97 will be adjusted so that 2/3 of the decrease will be eliminated. For FY98, if the amount negotiated is less than the FY96 level, 1/3 of any decrease from the FY96 level will be eliminated. If [Temple] and SCHC do not agree on or before July 29, 1994 as to the net amounts of AS&T payable by SCHC for FY93 and FY94, either party may submit that issue to dispute resolution in accordance with Paragraph 19.

Appellee asserts that this paragraph of the Affiliation Agreement is riddled with ambiguities and that a number of the terms thereof are meaningless to any reviewer not attendant the real and the legal relationships between the parties. Appellee urges that such terms as *AS&T, net payments, FY,*

*base year, FY level,* and *net amounts,* are all so ambiguous as to require the presentation of extrinsic evidence. The glimmer of the validity of this contention is at best ephemeral since, while the need for translation of one term is apparent, that need for translation does not equate to ambiguity.[1] No one will dispute that the parties to this appeal agree upon a single meaning for each of these terms. Indeed, both appellee and the trial court so acknowledge:

> The BRIEF OF APPELLEE, although using the qualifier *ambiguous,* refers to the phrases as *shorthand references* (emphasis supplied)

The TRIAL COURT adopted appellee's proposed finding of fact No. 12 which relates:

> 12. There are several reasons why the 1994 Affiliation Agreement contains such undefined, shorthand terms and references. Because the parties knew each other well and had been dealing with each other for years, the parties used words and phrases in the agreement that were ones that the parties were accustomed to using in their dealings with each other. One who had not participated in the drafting of the agreement, therefore, would not understand the meaning of those terms....

The term *net payment* is the object of special emphasis by appellee. In fact, it would seem to some that the asserted uncertainty of all of the other terms are but makeweight and the recitation thereof designed to serve as a drum roll for the contention that the term *net payment* requires translation and reference to earlier agreements between the parties. We disagree, for the term *net payment* does not even achieve the need for translation, let alone attain such uncertainty as to invoke the designation *ambiguity* and thereby permit appellee to proceed to the presentation of extrinsic evidence. Rather, the term obviously implicates the calculation of the *AS&T* sum under the 1994 Affiliation Agreement, and only an advocate

---

1. The parties well understood that AS&T translated to Administration, Supervision, and Teaching. The other terms do not even require translation.

would assert it is synonymous with the term *offset* in the 1990 Affiliation Agreement.

■ Appellee presented to the trial court quite an extensive—and impressive—narrative as its proposed findings of fact, and recited that narrative in such rhythmic, lulling fashion as to not only compel assent, but also to dispel dissent. Thus, there was abundant basis for the trial court to incorporate, without a single correction or change, the entire 77 pages and all 210 findings of fact presented by appellee. Similarly, the presentation of oral argument by appellee to this Court found the listener humming the melodies spun by appellee much as the message of the song is obscured by the compulsion to follow the bouncing ball. The appellate process, however, enables three judges to scrutinize the entire record, and only after undertaking intense study, analysis, and discussion, proceed to decision and expression. The members of this panel have completed that critical process, and, while one of our number shares the view of the trial judge, the majority concludes that, however clear the vision of those who see the declaration of breach by appellant as the untoward scheme of an entrepreneur to declare default so as to be loosed from what has become unfavorable contractual obligations, or to reap benefit from changed circumstances [2], the courts are not

**2.** This Court is aware of the grave concerns of informed observers who would urge that this case exemplifies the crisis presently confronting providers, a crisis for which those commentators reserve such vivid descriptions as:

> The heartbeat of the contemporary hospital is no longer found in the operating room, but in the computer control center, for the process of healing is no longer directed by the doctors and nurses but by administrators and CPAs and insurance moguls.

> \* \* \* \*

> The solitary voices of citizens have become a ground swell of demand by the citizenry that the government, which a century ago employed anti-trust principles to apply halter and rein to entrepreneurs who had perverted the capitalist system, again devise and enforce restrictions upon those predator entrepreneurs who view as prey hospitals and schools of medicine, solely for the purpose of keeping the financier in his castle and the patient at his gate, while relegating the doctors to the carriage house.

It is not, however, our constitutionally assigned role to address such ethical, moral, or social issues, for that prerogative is reserved to the

permitted to examine the motive for or benefit from a declaration of default. Nor may the courts adjust any adversity befalling appellee from the agreement into which it entered, or supplement provisions which appellee, at the time of execution, found satisfactory and acceptable, since it is not the role of the judiciary to address subsequent misgivings or later regrets of a party to a contract. *See: Trans–Fuel, Inc. v. Saylor,* 440 Pa. 51, 56–57, 269 A.2d 718, 721 (1970); *New Charter Coal Co. v. McKee,* 411 Pa. 307, , 191 A.2d 830, 833 (1963); *Meeting House Lane, Ltd. v. Melso,* 427 Pa.Super. 118, , 628 A.2d 854, 857 (1993), *allo. denied,* 537 Pa. 633, 642 A.2d 486 (1994). Instead, the courts, under firmly established law and prudent principle, are restricted to a review of the clear and unequivocal terms of the contract. The ruling that the 1994 Affiliation Agreement was not ambiguous, and the consequent preclusion of extrinsic evidence renders moot any other issues arising from the findings of fact reached by the trial court.

There remains, however, the question of whether the trial court, nonetheless, properly proceeded to the entry of a preliminary injunction. The litany of harm which Temple would suffer in the absence of a preliminary injunction is arguably enormous. We do not, however, undertake a consideration of whether or not the specter of those dreadful consequences can be resolved by monetary damages, because:

> The relief granted by the trial court was, in effect, a *permanent* injunction, and the prerequisite that the asserted harm is irreparable and uncompensable by money damages is a factor for consideration only during review of the issuance of a *preliminary* injunction.

> The initial prerequisite for issuance of a *preliminary* injunction is a strong likelihood of success on the merits, a likelihood here not present since, as has been earlier discussed, it was error for the trial court to proceed to the admission of extrinsic evidence.

legislature. *Cf. McClellan v. Health Maintenance Organization of Pennsylvania,* 413 Pa.Super. 128, 134 n.6, 604 A.2d 1053, 1056 n. 6 (1992), *allo. denied,* 532 Pa. 664, 616 A.2d 985 (1992).

While appellee labeled the relief sought as a preliminary injunction, and the trial court termed the relief it granted as a preliminary injunction, the order of the trial court did not simply preserve the *status quo* until the trial court was able to undertake complete resolution of the issues and final disposition of the dispute between the parties, but instead proceeded to the entry of an injunction which was *permanent* in nature, when the trial court ORDERED that:

1. All disputes between SCHC, AHERF and Temple concerning the 1994 Affiliation Agreement and the Sub–Lease Agreement, including AHERF"s and SCHC's purported claim that Temple is in breach for failure to make rent payments, shall be submitted to mediation pursuant to ¶ 25 of the 1994 Affiliation Agreement.

2. The parties and the mediator(s) shall proceed with mediation consistent with the findings of fact and conclusions set forth in this court's opinion.

3. This court shall maintain supervisory jurisdiction over the mediation process to ensure that the parties comply with the provisions of the 1994 Affiliation Agreement.

4. AHERF and SCHC shall rescind their purported termination of the 1994 Affiliation Agreement and Sub–Lease Agreement.

It is further ordered that Allegheny Health Education and Research Foundation ("AHERF") and St. Christopher's Hospital for Children ("SCHC"), their officers, agents, employees and assignees are hereby directed to comply fully with all of their obligations pursuant to the Affiliation Agreement dated June 14, 1994; and the Sub–Lease Agreement dated March 23, 1990, including without limitation that SCHC and AHERF shall:

1. not directly or indirectly interfere with Temple pediatric faculty's use and rights to quiet enjoyment of the premises covered by ¶ 17.1 of a certain Sub–Lease, which includes but is not limited to offices, out-patient practice areas, and research space that these faculty occupy in the SCHC Professional Arts Building;

2. not directly or indirectly employ any Temple pediatric faculty other than as described in ¶ 12 of the 1994 Affiliation Agreement;

3. not directly or indirectly interfere with the access of Temple faculty, medical students, residents or fellows to SCHC or treatment of patients at SCHC;

4. not directly or indirectly interfere with Temple faculty supervision or education of medical students, residents and fellows at SCHC, nor with any research undertaken by Temple, its faculty or staff at SCHC;

5. AHERF and SCHC shall rescind their notice of termination of Dr. Rezvani as co-chair of the executive committee.

It is thus apparent that the trial court proceeded to final resolution of the issues presented. Because the trial court did not simply preserve the *status quo* but proceeded to a final resolution, the injunction, while labeled *preliminary,* is *de facto* a *permanent* injunction, and our scope of review is well defined:

The scope of review on an appeal from a decree upholding a grant of a permanent injunction is very limited. *Den–Tal–Ez, Inc. v. Siemens Capital Corp.,* 389 Pa.Super. 219, 226, 566 A.2d 1214, 1217 (1989). The Superior Court is bound by the findings of fact made by the chancellor, and must accord them the weight of a jury verdict where supported by competent evidence. *Id.* However, the Superior Court is not bound by the reasoning of the lower court regarding its factual and legal conclusions, and may reverse for an abuse of discretion or error of law. *Id.*

As our earlier discussion recites, we are compelled to the conclusion that the trial court committed an error of law when it permitted the introduction of extrinsic evidence in the absence of an ambiguity in the 1994 Affiliation Agreement, and it is upon that basis that we reverse the order of the court insofar as it is a *de facto permanent* injunction.

Even if the relief granted were to be considered a preliminary injunction, we are not satisfied that all of the

prerequisites for the entry of preliminary injunction have been established. Appellee acknowledges that appellant has correctly stated in its brief the following relevant principles:

> This court's scope of review over a trial court's grant of a preliminary injunction is to determine whether reasonable grounds exist to support the trial court's decision, or whether the trial court has committed a clear abuse of discretion or an error of law. *E.g., Renee Beauty Salons, Inc. v. Blose–Venable,* 438 Pa.Super. 601, 604, 652 A.2d 1345, 1347, *allo. denied,* 541 Pa. 627, 661 A.2d 874 (1995).

> A preliminary injunction should be granted only if all of the following four "essential prerequisites" are proven: (i) a strong likelihood of success on the merits; (ii) a showing of immediate and irreparable harm that cannot be compensated by money damages; (iii) a showing that greater injury will result if preliminary injunctive relief is denied than if such injunctive relief is granted; and, (iv) a showing that a preliminary injunction would restore the status quo. *See Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 252–53, 602 A.2d 1277, 1282–83 (1992)(citing cases); *John G. Bryant Co. Inc. v. Sling Testing and Repair, Inc.,* 471 Pa. 1, 7, 369 A.2d 1164, 1167 (1977).

Since the trial court admitted the claim of harm as extrinsic evidence, and we have concluded that introduction of extrinsic evidence in the absence of an ambiguity in the 1994 Affiliation Agreement composed an error of law, it follows that appellee has not met the initial prerequisite of the threshold test for a preliminary injunction, namely, the strong likelihood that it would prevail upon the merits of this contract case.

Thus, it is that we reverse the order of the trial court, and remand the case to the trial court for further proceedings consistent herewith.

Order reversed. Case remanded. Jurisdiction relinquished.

EAKIN, J., files a dissenting opinion.

EAKIN, Judge, dissenting:

This appeal argues the trial court should not have granted an injunction. The court did so based on a record that included "extrinsic evidence," which was admitted on a finding that the 1994 Affiliation Agreement, specifically Paragraph 11 thereof, was ambiguous. If that evidence was properly considered, the injunction issued properly. Because I agree that the terms "net payment" and "net amount" are ambiguous, I am constrained to dissent from the majority's compelling position.

Temple University sought a preliminary injunction, asserting that it was not in violation of Paragraph 11; SCHC countered that such a violation was clear. As the trial court was charged with determining what these "net" figures were, in order to determine whether the parties complied with their payment obligations, and as the Agreement itself does not say how the "net" is derived or how it is calculated, how else, except through extrinsic evidence, could the court determine what the terms encompassed?

Paragraph 11 twice uses the term "net" to modify a term representing money flowing from SCHC to Temple. In using the term "net," the parties obviously meant to distinguish "gross" payment. "Net" means after charges or deductions, be it income, payments, assets, amounts, or earnings. If "net" means "net," something is to be deducted from the negotiated "level" set forth; otherwise the term "net" is improperly used in Paragraph 11 and connotes to the parties something different from its dictionary meaning. We cannot presume the erroneous inclusion of such a commonly understood term. The clause is therefore facially incomplete, because it demands unknown calculations. As there is no realistic explanation apparent within this paragraph or the remainder of the agreement, I find the term ambiguous.

In *Maguire v. Osborne*, 384 Pa. 430, 121 A.2d 147 (1956), the issue revolved around the term "net profits," which were used to calculate certain compensation. Our Supreme Court wres-

tled with what deductions from the gross income of the company were intended, and noted:

> It has long been established in this State that, where a contract is susceptible of two different interpretations, the one that the parties themselves put upon it is the one that the courts will adopt and enforce. In *Gass's Appeal*, 73 Pa. 39, 46, Mr. Justice Agnew said that 'when a contract is capable of two different interpretations, that which the parties themselves have always put upon it, and acted upon, especially as here for a long series of years, a court will follow, because it is the true intent and meaning of the parties * * *.' That statement has since been cited and applied a number of times down to *Foulke v. Miller*, 381 Pa. 587, 595, 112 A.2d 124; see, also, Restatement, Contracts, § 235(e).

*Id.* at 439–40, 121 A.2d at 152.

Similar cases have required the admission of extrinsic evidence to determine just what "net" means. *See, e.g., Lohmann v. Piczon*, 338 Pa.Super. 485, 487 A.2d 1386 (1985) (remanded "so that parol evidence may be admitted to clarify the term 'net income after taxes' "); *DeWitt v. Kaiser*, 335 Pa.Super. 258, 484 A.2d 121 (1984) (abuse of discretion to disallow evidence of intended meaning of "income").

If the parties meant "gross payment," they would have said so. They said "net," and if one cannot tell what comprises the net, extrinsic evidence must be looked to for the explanation. As there is no means by which the learned trial court could make this determination from the agreement alone, the consideration of extrinsic evidence was justified in my judgment, and I would find no abuse of discretion in it doing so. Therefore, with all due respect to my colleagues' cogent analysis, I am constrained to dissent.