**JUDGE TECHNICAL SERVICES, INC. and Judge, Inc., Appellees**

v.

**Thomas CLANCY, Alliance Consulting Group, Inc., Lawrence J. Senko and Brett Pinto, Appellants.**

Superior Court of Pennsylvania.

Argued Oct. 29, 2002.

Filed Dec. 17, 2002.

Marvin L. Wilenzik, Blue Bell and David J. Porter, Pittsburgh, Counsel for appellants on appeal only.

Michael D. Kristofco, Blue Bell, for appellee.

Before: JOHNSON, BENDER, and KELLY, JJ.

KELLY, J.

¶ 1 Appellants, Thomas Clancy ("Clancy"), Lawrence J. Senko ("Senko"), Brett Pinto ("Pinto"), and Alliance Consulting Group, Inc. ("Alliance"), ask us to review the order and judgment of the Montgomery County Court of Common Pleas, which entered default judgment and awarded damages in favor of Appellees, Judge Technical Services, Inc. ("JTS") and Judge Inc., ("Judge"). Specifically, Clancy, Senko, Pinto, and Alliance challenge the court's entry of default judgment. They further assail the court's calculation of compensatory damages and its award of punitive damages. Finally, Clancy, Senko, Pinto, and Alliance claim the court did not have jurisdiction over Pinto, and the court fashioned an inappropriate permanent injunction against them. We hold the trial court (1) properly entered default judgment against Clancy, Senko, Pinto, and Alliance; (2) properly calculated an award of compensatory damages; (3) correctly awarded punitive damages against Alliance; (4) properly exercised jurisdiction over Pinto; and, (5) fashioned an appropriate permanent injunction against Clancy, Senko, Pinto, and Alliance. Accordingly, we affirm the order and judgment of the trial court.

¶ 2 The relevant facts and procedural history of this case as gleaned from the certified record are as follows. JTS and Judge are in the personal placement industry. JTS places individuals in contract or temporary positions with employers whereas Judge specializes in permanent placement. Both JTS and Judge pool prospective placement employees from their respective and expansive databases. On September 3, 1991, Judge hired Pinto as a recruiter in its Philadelphia area office. Upon accepting his position with Judge, Pinto signed an employment contract which prohibited him from working for a competitor of Judge within 100 miles of a Judge company or subsidiary for one year following the termination of his employment. On or about October 1997, Pinto resigned from Judge and started work for Alliance (then known as Tech–Staff). Although Alliance was a competitor of Judge, and Pinto was to work for Alliance in the Philadelphia area, the three parties came to an agreement which allowed Pinto to work in the Philadelphia area. Under the agreement, Judge would forebear from enforcing its employment contract with Pinto, provided Pinto refrained from contacting any pre-existing applicants or clients of Judge, unless Pinto could prove these persons worked with Alliance prior to Pinto's employment therewith. As per the new agreement, Judge could enforce its original employment agreement with Pinto if Pinto were to violate the terms of his new agreement with Judge. The original agreement between Pinto and Judge provided in part:

I. Both parties agree that the breach of this restrictive covenant by [Pinto] will cause irreparable harm and injury to [Judge] and that the only effective and adequate remedy available to [Judge] for such a breach is by injunctive relief both preliminary and final and both parties agree to the jurisdiction of the equitable powers of the appropriate court to obtain such relief. **The parties further agree that the restrictive covenant set forth herein shall be extended for a period of time equal to any period of time during which [Pinto] is in violation of its provisions.**

J. Notwithstanding the equitable relief available to [Judge], both parties, in the

event of a breach of this covenant, understand and agree that the uncertainties and delay inherent in [the] legal process would result in a continuing breach for some period of time, and therefore, continuing injury to [Judge] until and unless it can obtain such equitable relief and/or such relief may not be available under prevailing law. Therefore, in addition to such equitable relief, [Judge] shall be entitled to monetary damages for any said period of breach, until the termination of such breach, equitable relief, or the expiration of this covenant, **in an amount deemed reasonable by the Court to cover all actual losses, all monies received by [Pinto] as a result of said breach, and all costs and attorney's fees incurred by [Judge] in enforcing this agreement. . . .**

(*See* Agreement attached as Exhibit C to the Complaint of JTS and Judge; R.R. at 44a–50a.) After starting work with Alliance, Pinto solicited Judge's clients and prospective employees in violation of his agreement with Judge.

¶ 3 Senko worked for JTS in its Philadelphia area office from 1990 to 1997. Senko and JTS entered into an employment contract. The agreement prohibited Senko from engaging in an enterprise competitive with JTS and located within 50 miles of its Philadelphia area office for a period of 18 months following the termination of the employment agreement. (*See* Agreement attached as Exhibit B to the Complaint of JTS and Judge; R.R. at 38a–42a.) Senko also agreed he would not solicit any accounts, staff or personnel of JTS or divulge any names or addresses or any information concerning any accounts, customers, business patrons, or technical personnel of JTS for the 18–month period following termination. (*Id.*) Senko further agreed that if he violated the terms of the agreement, JTS would be entitled to in-

junctive relief and legal fees. Finally, the agreement provided that damages resulting from a violation of the agreement would:

...be fixed at an amount equal to the gross profit, or twenty-five (25%) percent of the sales, whichever is greater, resulting from business generated by [Senko] either directly or indirectly on his own account...or otherwise in conjunction with any other person or entity through soliciting or otherwise competing for accounts or personnel which became known to him through his employment with [JTS].

(*Id.* at ¶ 12). Just prior to leaving JTS for Alliance, Senko approached another employee of JTS and asked her if she was interested in taking names from the JTS database and selling them. Senko told the other JTS employee he had made between $60,000.00 and $70,000.00 selling names from JTS' database. In his final year at JTS, Senko generated $3.6 million in revenue for JTS. (*See* N.T. Damages Hearing, 3/31/99, at 27; R.R. at 1250a.)

¶ 4 Clancy was also employed by JTS. Clancy was a sales manager in JTS' Philadelphia area office from 1992 until September 1997. In January 1997, Clancy was promoted to vice president of the New England region and was put in charge of JTS' national division one month later. Clancy's employment agreement with JTS was, in all material respects, identical to Senko's employment agreement with JTS, including remedies for damages resulting from a breach. (*See* Agreement attached as Exhibit A to the Complaint of JTS and Judge; R.R. at 31a–35a.) When Clancy left JTS in September 1997, he went to work for Alliance, taking two other high-ranking JTS employees with him. In 1996, Clancy had generated $3.2 million in

revenue for JTS. (*See* N.T. Damages Hearing, 3/31/99, at 27; R.R. at 1250a.)

¶ 5 Eventually, JTS and Judge filed suit against Alliance, Senko, Clancy and Pinto seeking enforcement the employment agreements, compensation for the breaches thereof, and compensation for the alleged theft and sale of the databases by Senko. In their complaint, JTS and Judge alleged Alliance knew of the non-compete agreements between JTS or Judge and Senko, Clancy, and Pinto. JTS and Judge further alleged their databases and client contact information was misappropriated when Senko, Clancy and Pinto went to work for Alliance. JTS and Judge also asserted that following the departure of these employees, Alliance's business grew at high rate while their businesses suffered as a result of the misappropriated databases and client contact information.

¶ 6 JTS and Judge also sought damages against Alliance for tortious interference with contractual relations. JTS and Judge then moved for immediate injunctive relief which was granted in part. Next, JTS and Judge moved for expedited discovery on the matter. The trial court made a series of rulings on the discovery motions of JTS and Judge. Alliance, Senko, Clancy, and Pinto, however, repeatedly failed to abide by these orders. On August 11, 1998, the trial court entered a default judgment against Alliance, Senko, Clancy, and Pinto. The trial court found they had all repeatedly and intentionally refused to abide by the numerous discovery orders of the trial court. (*See* Order filed August 11, 1998, at 1–4). The trial court concluded "[The] failure [of Alliance, Senko, Clancy, and Pinto] to answer the interrogatories on three separate occasions warrant the entry of sanctions against [Alliance, Senko, Clancy, and Pinto] and judgment as to liability for [JTS and Judge] since [Alliance, Senko, Clancy, and Pinto] have un-reasonably prevented the cause of action from going forward." (*Id.* at 5). Following a series of hearings on the damages suffered, the trial court awarded the following damages:

1. $198, 401.68 ($148,974.29 in salary plus $49,427.39 in attorney's fees) in favor of Judge against Pinto for breach of contract.

2. $209,927.39 ($160,500 in salary plus $49,427.39 in attorney's fees) in favor of JTS and against Senko for breach of contract.

3. $424,427.39 ($375,000 in salary plus $49,427.39 in attorney's fees) in favor of JTS and against Clancy for breach of contract.

4. $148,974.29 in favor of Judge and against Alliance for tortious interference with Pinto's employment contract.

5. $160,500.00 in favor of JTS and against Alliance for tortious interference with Senko's employment contract.

6. $375,000.00 in favor of JTS and against Alliance for tortious interference with Clancy's employment contract.

7. $60,000.00 in favor of JTS against Senko for theft of trade secrets by Senko.

8. The trial court assessed $700,000.00 in punitive damages against Alliance ( ⅔ to JTS and ⅓ to Judge).

(*See also* Trial Court Opinion, filed June 17, 2002, at 1–2). The trial court denied all motions for post-trial relief and entered judgment in favor of JTS and Judge on November 19, 2001. Alliance, Senko, Clancy, and Pinto then filed this timely appeal.

¶ 7 On appeal, Alliance, Senko, Clancy, and Pinto present the following issues for our consideration: [1]

> WHETHER THE TRIAL COURT ERRED BY ESTIMATING [JTS' AND JUDGE'S] ALLEGED DAMAGES WITHOUT ANY EVIDENTIARY BASIS[?]
>
> WHETHER THE TRIAL COURT'S JUDGMENT WAS CONTRARY TO LAW IN THAT IT SHIFTED THE BURDEN OF PROOF ON DAMAGES FROM [JTS AND JUDGE] TO [ALLIANCE, SENKO, CLANCY, AND PINTO]?
>
> WHETHER THE TRIAL COURT'S JUDGMENT WAS CONTRARY TO LAW IN THAT IT IMPROPERLY DOUBLE–COUNTED [JTS' AND JUDGE'S] DAMAGES?
>
> WHETHER THE TRIAL COURT'S AWARD OF PUNITIVE DAMAGES AS A DISCOVERY SANCTION WAS CONTRARY TO LAW AND UNREASONABLY EXCESSIVE?
>
> WHETHER THE TRIAL COURT HAD JURISDICTION OVER PINTO IN THE FIRST INSTANCE, AND WHETHER THE TRIAL COURT'S ENTRY OF AN INJUNCTION AND FINDING OF DAMAGES AGAINST PINTO WAS CONTRARY TO LAW AND UNSUBSTANTIATED BY ANY EVIDENCE OF WRONGDOING[?]
>
> WHETHER THE PERMANENT INJUNCTION ENTERED BY THE TRIAL COURT AGAINST [ALLIANCE, SENKO, CLANCY, AND PINTO] WAS CONTRARY TO LAW AND OVERLY BROAD IN ITS TERMS?

(Alliance's, Senko's, Clancy's and Pinto's Brief at 3).

¶ 8 The first two allegations of error relate to the award and calculation of compensatory damages. For ease of disposition, we will address them together. Alliance, Senko, Clancy, and Pinto allege JTS and Judge failed to adduce any evidence of damages at the hearing on damages. Alliance, Senko, Clancy, and Pinto claim the court's reward of compensatory damages was mere speculation in the absence of actual evidence of loss. Alliance, Senko, Clancy, and Pinto also contend the trial court erred in "switching the burden" to them at the hearing on damages. Alliance, Senko, Clancy, and Pinto conclude the trial court erred in fashioning its award of compensatory damages. We disagree.

¶ 9 Initially we note,

> The general rule in this Commonwealth is that the plaintiff bears the burden of proof as to damages.
>
> The determination of damages is a factual question to be decided by the fact-finder. The fact-finder must assess the testimony, by weighing the evidence and determining its credibility, and by accepting or rejecting the estimates of the damages given by the witnesses. Although the fact-finder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages. The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof.

*Penn Elec. Supply Co., Inc. v. Billows Elec. Supply Co., Inc.,* 364 Pa.Super. 544, 528 A.2d 643, 644 (1987) (internal citations omitted). Also,

> [A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the

---

1. We have reordered the issues in the manner in which we will address them.

plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible. In *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544, [548–49 (1931),] the court said: It would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. The risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party. The precise amount cannot be ascertained by a fixed rule, but must be matter of opinion and probable estimate. And the adoption of any arbitrary rule in such a case, which will relieve the wrongdoer from any part of the damages, and throw the loss upon the injured party, would be little less than legalized robbery.

*Com. Trust Co. of Pittsburgh v. Hachmeister Lind Co.*, 320 Pa. 233, 239–40, 181 A. 787, 790 (1935) (internal quotations and some citations omitted).

¶ 10 Instantly, Alliance, Senko, Clancy, and Pinto repeatedly and intentionally ignored the numerous discovery orders of the trial court. After entering a default judgment in favor of JTS and Judge, the court held four separate hearings on the issue of damages. At the hearings, it was apparent that JTS' and Judge's attempts to calculate the exact damages caused by the actions of Alliance, Senko, Clancy, and Pinto was frustrated by their repeated disregard of the trial court's discovery orders. Now, Alliance, Senko, Clancy, and Pinto ask us to reward them for their behavior. We decline to do so. *See id.* JTS and Judge were able to show Senko, Clancy and Pinto made significant incomes while employed by Alliance. JTS and Judge also showed the three men generated millions of dollars in revenue while employed with JTS and Judge, respectively. JTS and Judge were also able to show their business suffered following the violations of the employment contracts. Contrary to the assertions of Alliance, Senko, Clancy, and Pinto, the trial court's assessment of damages was not based on sheer conjecture. *See Penn Elec. Supply Co., Inc., supra.* The trial court was able to fashion a just and reasonable estimate of the damage based on the relevant data supplied to the court during the hearings. *Id.* Much to its credit, the trial court was able to fashion an appropriate remedy in spite of the stonewalling, while placing the burden of proof properly on JTS and Judge. (*See* N.T. Damages Hearing, 3/31/99, at 54; R.R. at 1277a.) Thus, the claim that the trial court "switched the burden" of proof to Alliance, Senko, Clancy, and Pinto is quite specious. Therefore, the trial court did not err in making its award of money damages to JTS and Judge. Accordingly, Alliance's, Senko's, Clancy's, and Pinto's first two issues warrant no relief.

¶ 11 Next, Alliance contends the trial court erred in awarding "double damages" to JTS and Judge in its assessment of damages against Alliance. Alliance alleges that in awarding damages equal to the respective salaries of Senko, Pinto, and Clancy, and then awarding damages in the same amount against Alliance for tortiously interfering with the employment contracts between JTS and Judge and Senko,

Pinto, and Clancy, the court bestowed a "windfall" upon JTS and Judge. Alliance concludes JTS and Judge were awarded the same damages twice and that this cannot stand. We disagree.

¶ 12 "[A]n injured party cannot recover twice for the same injury, based on the theory that double recovery results in unjust enrichment." *Archer v. State Farm Ins. Co.*, 419 Pa.Super. 558, 615 A.2d 779, 783 (1992), *appeal denied*, 535 Pa. 612, 629 A.2d 1375 (1993) (citation omitted). In this Commonwealth, "[o]ne who intentionally and improperly interferes with the performance of a contract...between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other **from the third person's failure to perform the contract.**" *Joseph D. Shein, P.C. v. Myers*, 394 Pa.Super. 549, 576 A.2d 985, 988 (1990), appeal denied, 533 Pa. 600, 617 A.2d 1274 (1991) (emphasis in original) (citations omitted). Further, "once a finding of tortious interference has been made, the tortfeasors must pay damages." *Id.* at 986.

¶ 13 Here, the trial court entered default judgment against Alliance, Senko, Clancy, and Pinto after they refused to abide by the court's discovery orders. The court held hearings on the amount of damages suffered by JTS and Judge. JTS' employment contracts with Senko and Clancy entitled it to the greater of the gross profits or 25% of the sales generated by either Senko's or Clancy's unlawful use of JTS' contacts and clients. Because of the repeated failure of Alliance, Senko, Clancy, and Pinto to abide by the discovery orders of the trial court, the court was unable to ascertain with precision the revenues produced by Senko and Clancy through the use of JTS contacts and clients. *See Com. Trust Co. of Pittsburgh, supra.* JTS, however, produced enough evidence to show Senko and Clancy produced millions of dollars in revenue while at JTS. As a result of the default judgment entered against it for tortious interference with the employment agreements, Alliance was responsible for the revenue lost by JTS through the breach of the employment agreements. *See Joseph D. Shein, P.C., supra.* The fact that the court awarded JTS and Judge damages from Alliance equal to the damages assessed against Senko and Clancy (minus attorney's fees) does not mean the court awarded a "double recovery." Because of the uncertainty of the actual damages (which was due in large part to the failure of Alliance, Senko, and Clancy to abide by the discovery orders) the trial court assessed damages against Senko and Clancy equal to their salary. (*See* Findings of Fact Conclusions of Law and Order, filed June 27, 2000, at 4–5.) The evidence generated at the damages hearings showed the two men generated much more in revenue than they received in salary. *See Com. Trust Co. of Pittsburgh, supra.* The trial court, however, also reasonably concluded the amount of damages suffered through Alliance's tortious interference with JTS' contracts with Senko and Clancy was at least equal to double the salary procured by Senko and Clancy during the 18 months following their employment with JTS. *Id.* As noted, Senko and Clancy produced millions of dollars in revenue for JTS while employed with JTS. Keeping in mind the overall revenue produced, the damages assessed against Senko's and Clancy's salaries was only a small reflection of either the amount of gross profit procured by the two or 25% of their sales.[2] Thus, the damages as-

---

2. This was the agreed upon measure of dam- ages JTS could recover against the two as per

sessed against Alliance for interfering with those contracts was a **conservative** estimate of JTS' losses in excess of Senko's and Clancy's salaries reasonably attributable to their failure to abide by the terms of their employment contracts. *See Joseph D. Shein, P.C., supra.*

¶ 14 In addition, Pinto's employment agreement with Judge permitted Judge to recover damages for breach:

in an amount deemed reasonable by the Court to cover all actual losses, all monies received by [Pinto] as a result of said breach, and all costs and attorney's fees incurred by [Judge] in enforcing this agreement. . . .

(*See* Agreement attached as Exhibit C to the Complaint of JTS and Judge; R.R. at 44a–50a.) While the court permitted Judge to recover all monies received by Pinto for his breach, including attorney's fees, this award did not cover all actual losses suffered as a result of Pinto's breach of his employment contract with Judge. Based on the just and reasonable inferences of the trial court, we may likewise conclude Pinto generated revenue for Alliance well in excess of his salary. That excess represented a measure of the loss suffered by Judge due to Alliance's actions and Pinto's failure to abide by the terms of his employment contract. *See Joseph D. Shein, P.C., supra.* The trial court concluded the amount of revenue generated over and above Pinto's salary was at least equal to that salary and determined that amount to reasonably represented the damages suffered by Judge as a result of Alliance's tortious conduct. *See Com. Trust Co. of Pittsburgh, supra.* Therefore, the court did not award "double damages" to JTS or Judge, and those awards stand.

¶ 15 Next, Alliance alleges the trial court erred in assessing punitive damages

their employment agreements.

against it. Alliance contends the court assessed punitive damages against it solely for its role in disregarding the trial court's discovery motions. In addition, Alliance argues the $700,000.00 award was unreasonable and excessive. Alliance concludes this Court must reverse the award of punitive damages. We disagree.

¶ 16 "[P]unitive damages are awarded to punish a defendant for certain outrageous acts and to deter him **or others** from engaging in similar conduct." *G.J.D. by G.J.D. v. Johnson,* 552 Pa. 169, 176, 713 A.2d 1127, 1131 (1998) (citation omitted) (emphasis in original). "Under Pennsylvania law, a reasonable relationship must still exist between the nature of the cause of action underlying the compensatory award and the decision to grant punitive damages." *Sprague v. Walter,* 441 Pa.Super. 1, 656 A.2d 890, 926 (1995), *appeal denied,* 543 Pa. 695, 670 A.2d 142 (1996).

¶ 17 As our Supreme Court has stated, "If no cause of action exists, then no independent action exists for a claim of punitive damage since punitive damages is only an **element** of damages. To this extent, punitive damages must, by necessity, be related to the injury-producing cause of action." *Kirkbride v. Lisbon Contractors, Inc.,* 521 Pa. 97, 101, 555 A.2d 800, 802 (1989) (emphasis in original).

¶ 18 "The degree of reprehensibility is the primary indicator of the reasonableness of a punitive damages award. The reprehensibility inquiry takes into consideration the fact that some wrongs are more blameworthy than others." *Pioneer Commercial Funding Corp. v. American Financial Mortg. Corp.,* 797 A.2d 269, 292 (Pa.Super.2002) (citing *Shiner v. Moriarty,* 706 A.2d 1228, 1241 (Pa.Super.1998)). Importantly,

The standard under which punitive damages are measured in Pennsylvania requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant. *Kirkbride[, supra* ] (citing Restatement (Second) of Torts § 908(2)). *Accord Tunis Brothers Co., Inc. v. Ford Motor Co.,* 952 F.2d 715, 740–41 (3d Cir.1991), *cert. denied,* 505 U.S. 1221, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992) (applying Pennsylvania law).

*Id.* at 290. Furthermore, this Court concluded it was appropriate for a trial court to allow consideration of discovery violations in fashioning a remedy which included punitive damages. *Id.* at 286–87.

 ¶ 19 Moreover, "[i]n Pennsylvania, punitive damages are awarded for 'outrageous conduct, that is, for acts done with a bad motive or with a **reckless indifference** to the interests of others.'" *Shared Communications Services of 1800–80 JFK Blvd. Inc. v. Bell Atlantic Properties Inc.,* 692 A.2d 570, 576 (Pa.Super.1997), appeal denied, 555 Pa. 704, 723 A.2d 673 (1998) (citing *Martin v. Johns–Manville Corp.,* 508 Pa. 154, 172, 494 A.2d 1088, 1097–98 (1985) (emphasis in original)). An amount of an award of punitive damages will not be reversed unless it shocks the Court's sense of conscious. *Id.* Finally,

> [t]he decision whether to sanction a party for a discovery violation and the severity of such a sanction are matters vested in the sound discretion of the trial court. We will not reverse a trial court's order imposing such a sanction unless the trial court abused its discretion.
>
> Rule 4019 of the Pennsylvania Rules of Civil Procedure expressly authorizes a trial court to enter a default judgment against a defendant who fails to comply

with the trial court's discovery orders. *See* Pa.R.C.P. 4019(c)(3). This Court has identified the following factors for trial courts to consider when determining an appropriate sanction under Rule 4019:

> (1) the nature and severity of the discovery violation;
>
> (2) the defaulting party's willfulness or bad faith;
>
> (3) prejudice to the opposing party;
>
> (4) the ability to cure the prejudice; and
>
> (5) the importance of the precluded evidence in light of the failure to comply.

*Luszczynski v. Bradley,* 729 A.2d 83, 87 (Pa.Super.1999), *appeal withdrawn,* 559 Pa. 692, 739 A.2d 1058 (1999).

 ¶ 20 Instantly, in awarding punitive damages the trial court stated, "...we do award punitive damages in the amount of $700,000.00 since we conclude that Defendant, Alliance, was indeed the driving force behind all Defendants' refusal to abide by our discovery orders." (*See* Findings of Fact and Conclusions of Law and Order, *supra* at 5.) We reject Alliance's conclusion that the trial court based its punitive damage award solely on Alliance's discovery violations. Such a narrow reading of the trial court's findings is not warranted. JTS and Judge alleged Senko, Pinto, and Clancy left their companies at the behest of Alliance. JTS and Judge further alleged these individuals misappropriated sensitive company data essential to their businesses, and used this information to further Alliance's business to the detriment of JTS and Judge. JTS and Judge maintained these actions cost them millions of dollars in lost revenue. JTS and Judge contended Alliance was not only complicit in these acts, but was a driving force behind them. Because of the willful and wanton disregard for the trial court's discovery orders by Alliance, Senko, Clan-

cy, and Pinto, the trial court appropriately entered default judgment against them. *See Luszczynski, supra.* Through its repeated disregard for the trial court's discovery orders, Alliance interfered with the truth-finding process of the court. *See Pioneer Commercial Funding Corp., supra.* Having entered default judgment against Alliance, the trial court found Alliance intentionally and tortiously interfered with Senko's, Clancy's, and Pinto's contractual relations with JTS and Judge, respectively. (*See* Findings of Fact Conclusions of Law and Order, *supra* at 5.) The evidence also showed Alliance generated millions of dollars in revenue for itself during this period. The conduct of Alliance in intentionally interfering with the contractual relations of the other parties alone warranted the award of punitive damages. *Id. See also Bell Atlantic Properties Inc., supra.* The trial court appropriately considered the nefarious purpose of Alliance in ignoring the court's discovery orders, which indicated that Alliance had the most to hide in the matter. *Id.* Therefore, having found Alliance intentionally interfered with the contractual relations of the parties, and intentionally disregarded the trial court's discovery orders, the trial court appropriately awarded punitive damages. *See Pioneer Commercial Funding Corp., supra.* The award of punitive damages will serve the dual purposes of punishing Alliance for its reprehensible behavior, and deterring Alliance from acting similarly in the future. *See Johnson, supra; Sprague, supra.* Therefore, the trial court's award of $700,000.00 in punitive damages against Alliance was appropriate and must also stand.

¶ 21 Next, Pinto alleges the trial court erred in awarding compensatory damages against him. Pinto asserts his "restrictive covenant" with Judge had expired before Judge filed its Complaint against Pinto. Pinto argues the trial court had no juris-

diction over Pinto because the agreement had already expired when Judge brought suit. Pinto concludes the trial court erred when it imposed sanctions and damages against him. We disagree.

¶ 22 "[T]he decision to sanction a party and the severity of the sanction is a matter vested in the discretion of the trial court." *Wolloch v. Aiken,* 756 A.2d 5, 13 (Pa.Super.2000), *appeal granted in part,* 564 Pa. 134, 764 A.2d 1051 (2000) (citing *Croydon Plastics v. Lower Bucks Cooling & Heating,* 698 A.2d 625 (Pa.Super.1997), *appeal denied,* 553 Pa. 689, 717 A.2d 1028 (1998)). Also,

> The court is required to strike a balance between the procedural need to move the case to a prompt disposition and the substantive rights of the parties. The court must examine the party's failure to comply in light of the prejudice caused to the opposing party. Whether the failure to provide information represents a willful disregard of a court order is also a factor to be considered in fashioning the severity of the sanction.

*Miller Oral Surgery, Inc. v. Dinello II,* 416 Pa.Super. 310, 611 A.2d 232, 234 (1992), *appeal denied,* 533 Pa. 651, 624 A.2d 111 (1993) (internal citations and quotations omitted). Furthermore, "a default judgment entered pursuant to Pa.R.C.P. 4019(c)(3) is comparable to a judgment entered after hearing." *Miller Oral Surgery, Inc. v. Dinello I,* 342 Pa.Super. 577, 493 A.2d 741, 743 (1985). Default judgments entered pursuant to Pa.R.C.P. 4019(c), determine the issue of liability. *See Edney v. Southeastern Pennsylvania Transp. Authority,* 356 Pa.Super. 160, 514 A.2d 194, 196 (1986).

¶ 23 Here, Pinto repeatedly and intentionally ignored the discovery orders of the trial court. After numerous attempts by the court to have Pinto comply with

these orders, the court properly entered a default judgment against Pinto pursuant to Pa.R.C.P. 4019(c). *See Wolloch, supra; Dinello II, supra.* Therefore, the issue of whether Pinto's contract with Judge had expired prior to Judge filing suit was foreclosed with the entry of the default judgment. *See Dinello I, supra; Edney, supra.* If Pinto thought the alleged expiration of his contract with Judge was a valid defense to Judge's claims against Pinto, he should have complied with the court's discovery orders and asserted his defense in a proper fashion. What Pinto characterizes as a lack of personal jurisdiction over him is actually a defense to Judge's cause of action against him. Moreover, Pinto's employment contract with Judge contained a clause which extended the life of the restrictive covenant in the event of a breach by Pinto. It stated: "The parties further agree that the restrictive covenant set forth herein shall be extended for a period of time equal to any period of time during which [Pinto] is in violation of its provisions." (*See* Agreement attached as Exhibit C, *supra;* R.R. at 44a–50a.) Therefore, whether the extension of Pinto's "covenant not to compete" was applicable could only have been decided after Judge proved Pinto had been violating his prior agreements with Judge. The default judgment entered against Pinto decided that issue in Judge's favor. *See Dinello I, supra; Edney, supra.* Therefore, the trial court was not divested of jurisdiction over Pinto and properly awarded damages to Judge. *Id.*

■■■ ¶ 24 Finally, Alliance, Senko, Clancy, and Pinto allege the permanent injunction entered by the trial court is overly broad and improper. Alliance, Senko, Clancy, and Pinto argue the court erred in extending the restrictive covenants of both Senko and Clancy for addi-

tional term of 18 months, because they never violated their employment agreements, and they abided by the restrictions in the preliminary injunction. Alliance, Senko, Clancy, and Pinto further argue the permanent injunction imposed on Pinto's activities was unlawfully imposed as Judge had already received the full benefit of its original employment agreement with Pinto before instituting its case against Pinto. Lastly, Alliance complains the imposition of a permanent injunction against them, which prohibits them from ever soliciting or hiring an employee of either JTS or Judge, is unjust. Alliance, Senko, Clancy, and Pinto conclude the permanent injunction is an unwarranted restriction on competition and cannot stand. We disagree.

■■■ ¶ 25 We note,

The scope of review on an appeal from a decree upholding a grant of a permanent injunction is very limited. The Superior Court is bound by the findings of fact made by the chancellor, and must accord them the weight of a jury verdict where supported by competent evidence. However, the Superior Court is not bound by the reasoning of the lower court regarding its factual and legal conclusions, and may reverse for an abuse of discretion or error of law.

*Temple University of the Com. System of Higher Educ. v. Allegheny Health Educ. and Research Foundation,* 456 Pa.Super. 314, 690 A.2d 712, 718 (1997) (internal citations omitted). "[T]he determination regarding the proper scope of an injunction is committed to the discretion of the trial court." *Christopher M's Hand Poured Fudge, Inc. v. Hennon,* 699 A.2d 1272, 1277 (Pa.Super.1997), *appeal denied,* 553 Pa. 686, 717 A.2d 1026 (1998) (citations omitted). The permanency of the injunction alone does not render the injunction unlawful. *Id.* A trial court may enter a permanent injunction following the imposi-

tion of a preliminary injunction. *See Buck Hill Falls Co. v. Clifford Press*, 791 A.2d 392, 396 (Pa.Super.2002) (citing *Soja v. Factoryville Sportsmen's Club*, 361 Pa.Super. 473, 522 A.2d 1129, 1132 (1987) (stating, "whether a preliminary injunction is granted or denied has no effect on whether a final, permanent injunction will ultimately be issued."))

¶ 26 In *Hennon, supra*, the appellant acquired the appellee's fudge manufacturer's trade secrets (ingredients and fudge manufacturing process) during the course of his employment. Prior to starting work for the appellee, the appellant had no fudge making experience. Before leaving his employment with the appellee, the appellant had access to the appellee's customer lists, business plans, and other confidential business and financial information, which the appellant misappropriated. *Id.* at 1274. After leaving his employ with the appellee, the appellant started his own fudge-making enterprise. The appellee moved to permanently enjoin the appellant from engaging in that enterprise and the trial court granted the permanent injunction. The appellant appealed and this Court affirmed the trial court's order, concluding a permanent injunction was the best way in which to protect the appellee's trade secrets. *Id.* at 1278.

¶ 27 Instantly, on June 27, 2000, the trial court issued a permanent injunction against Alliance, Senko, Clancy, and Pinto. The terms of the injunction, as against Senko, Clancy, and Pinto essentially imposed the same restrictions on the three that were imposed in their employment agreements with JTS and Judge. (*See* Permanent Injunction, filed 6/27/00, at 1–3; R.R. at 1736a–1738a.) Senko and Clancy were enjoined for a term of 18 months from competing with JTS within a 50–mile radius of their former JTS offices; servicing any customers with whom JTS had done business within the previous year of their termination of employment with JTS; soliciting any business contacts which became known to them through JTS; or divulging any information concerning any JTS accounts. (*Id.*) The court's injunction against Pinto resembled the restrictions against Senko and Clancy, except Pinto's injunction expired after one year, and it forbade Pinto from competing with JTS or Judge within 100 miles of his former Judge office. Finally, the injunction permanently forbade Alliance from interfering with any agreements between JTS or Judge and their employees; contacting any JTS or Judge employees during business hours when those persons are at work; soliciting any employees of JTS or Judge to cease employment with and begin working with Alliance; or soliciting or continuing to service any clients which had become known to Alliance through either Senko's, Clancy's or Pinto's breach of their respective employment agreements with JTS or Judge.

¶ 28 The trial court properly entered default judgment due to the repeated failure of Alliance, Senko, Clancy and Pinto to abide by the discovery orders, including the terms of the preliminary injunction. Therefore, the issue of their respective breaches and liability has been decided. *See Dinello I, supra; Edney, supra.* Thus, they cannot now assert they complied with the terms of the employment contracts. *Id.* Also, the fact that Alliance, Senko, Clancy and Pinto contend they abided by the preliminary injunction is of no moment. *See Buck Hill Falls Co., supra.* Alliance, Senko, Clancy and Pinto point to no precedent which restricts a trial court from entering a permanent injunction following the imposition of a preliminary injunction. *Id.* The terms of the permanent injunctions imposed on Senko, Clancy and Pinto will help to ensure JTS and Judge will have the opportunity to undo some of the damage caused by the breaches of their former employees, while not having to fend off further encroach-

ments by them. Therefore, the trial court did not abuse its discretion in entering the permanent injunctions against Senko, Clancy and Pinto. *See Hennon, supra; Temple University of the Com. System of Higher Educ., supra.*

¶ 29 Furthermore, Alliance was actively involved in the misappropriation of the databases and business contacts of JTS and Judge, which was severely detrimental to their businesses. *See Dinello I, supra.* The permanent injunction prohibits Alliance from further profiting from its misdeeds. Also, Alliance's fear that it can never hire any of JTS' or Judge's employees is unwarranted. The permanent injunction need not be read so broadly. While it forbids Alliance from soliciting any of JTS' or Judge's employees directly or indirectly through the use of third-parties, Alliance may still hire employees who contact Alliance on their own, or who contact Alliance in response to general employment advertisements. Thus, the injunction imposed against Alliance was proper. *See Hennon, supra; Temple University of the Com. System of Higher Educ., supra.* Therefore, Alliance's, Senko's, Clancy's, and Pinto's final issue on appeal is meritless.

¶ 30 For the foregoing reasons, we hold the trial court (1) properly entered default judgment against Clancy, Senko, Pinto, and Alliance; (2) properly calculated an award of compensatory damages; (3) correctly awarded punitive damages against Alliance; (4) properly exercised jurisdiction over Pinto; and, (5) fashioned an appropriate permanent injunction against Clancy, Senko, Pinto, and Alliance. Accordingly, we affirm the order and judgment of the trial court.

¶ 31 Order and judgment affirmed.