ALLEGHENY ANESTHESIOLOGY ASSOCIATES, INC., a Pennsylvania professional corporation, Appellant,

v.

ALLEGHENY GENERAL HOSPITAL, a Pennsylvania non-for-profit corporation, Appellee.

Jacalyn F. Allera, Joann Atkinson, Nancy A. Hovanec Bellora, Heather Boden, Cheryl Bristol, Darlene Brown, Stephanie Caldwell, Mary Jane Cichowicz, Colleen Coyne, Roslyn Corton, Patricia M. Criste, Edward Falenski, Cynthia S. Ketchmark–Green, Susan Jurik, Heidi Hillman, James Horvath, Denise Imperio, Angie Kelly, Margaret Langer, Susan B. Leahy, Margaret McCague, Mary Anne McClain, Patricia Meinert, Marianne Neal, Christie Oblak, Tracy Osborne, Sandra Poureshmenantalemy, Helen E. Ringel, Imy Rosenblatt, Lianne Santilli, Nino Servello, Patricia Smith, Tom Squillo, Joan Sweda, Judy Van Ryn, Barbara Wells, Shirley Winkler, Appellees,

v.

Allegheny Anesthesiology Associates, Inc., a Pennsylvania professional corporation, Appellant.

Superior Court of Pennsylvania.

Argued Dec. 4, 2002.

Filed May 12, 2003.

Reargument Denied July 18, 2003.

Kevin P. Lucas, Pittsburgh, for appellant.

Frederick W. Thieman, for Allera, etc., appellees.

David L. McClenahan, Pittsburgh, for Allegheny General Hosp., appellee.

BEFORE: HUDOCK, TODD, and GRACI, JJ.

OPINION BY GRACI, J.:

¶ 1 Appellant, Allegheny Anesthesiology Associates, Inc. ("AAA"), appeals from an order entered June 20, 2002, in the Court of Common Pleas of Allegheny County. We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

¶ 2 In June 1999, AAA entered into a contract with Allegheny General Hospital ("AGH") to provide anesthesia services at AGH through June 30, 2002. Pursuant to the agreement, employees of AAA, including physicians and certified registered nurse anesthetists ("CRNAs"), provided mutually agreed upon services to AGH's patients. In return, AGH reimbursed AAA for the salaries of the employees. The employment contracts between AAA and its CRNA employees contained the following non-compete covenant:

> In the event of termination of Employee's employment hereunder for any reason, Employee expressly agrees to abide by and be subject to the following restrictive covenant:
>
> (a) During the twenty-four (24) month period following termination, Employee shall not, directly or indirectly, as an owner, partner, lender, investor, shareholder, employee, officer, director or in any other capacity attempt to contract with, or compete against [AAA] at any facility where [AAA] has a contract to provide services, or at any facility at which [AAA] has provided services during the twelve (12) month period ending on the date of Employee's termination, including, but not limited to, [AGH] ... for the purpose of providing any anesthesia services and, further, Employee shall immediately resign from the staff of such medical facilities and agrees not to reapply for such staff privileges for a period of twenty-four (24) months.

Employment Contract, at 8, ¶ 20.

¶ 3 A dispute arose between AGH and AAA regarding AAA's refusal to participate in a health care reimbursement plan favored by AGH. In a letter to the AAA CRNAs dated April 8, 2002, AGH announced that AAA's continued non-participation would likely result in termination of AAA's contract. AAA and AGH ultimately agreed to allow their contract to expire, by its terms, on June 30, 2002.

¶ 4 AAA filed a complaint against AGH on April 15, 2002, accusing AGH of (1) tortiously interfering with the employment contracts between AAA and its anesthesiologist and CRNA employees; (2) materially breaching its agreement with AAA;

and (3) conspiring with other entities to harm AAA's business. AAA also sought a preliminary injunction enjoining AGH "and all others in active concert or participation with it, from attempting to induce any anesthesiologist or CRNA employee of [AAA] to terminate his or her employment with AAA, or from attempting to induce any such employee to accept employment with [AGH] or any third party." Notice And Motion For Preliminary Injunction, 4/15/02. On May 20, 2002, AGH filed a Motion for Special and Preliminary Injunction seeking to enjoin AAA from enforcing the non-compete covenants in the physician and CRNA employment agreements or, in the alternative, enforcing the alleged covenant with regard to facilities other than those specifically provided for in the employment agreement. Motion For Preliminary Objection, 5/20/02.[1] In an order dated May 23, 2002, the trial court required AAA, pursuant to its June 1999 agreement with AGH, to continue to provide anesthesiology services to AGH through June 30, 2002. The court also scheduled a hearing for June 17, 2002, to consider the enforceability of the non-compete covenant.

¶ 5 On May 23, 2002, AAA entered into a contract with University of Pittsburgh Medical Center ("UPMC") to provide anesthesia services at UPMC hospitals. Two days later, Dr. Stanley Weber, President of AAA, along with representatives of UPMC, offered positions at UPMC to each of the CRNAs employed at AGH. At a May 28, 2002 meeting, Dr. Weber and Andrea Badway, Chief Operations Officer of AAA, informed the CRNAs that: their employment would be terminated effective June 30, 2002, when the contract between AAA and AGH expired; AAA would be entering into a new affiliation with the UPMC network; UPMC would hire the CRNAs but only if they agreed to work for UPMC before the June 30, 2002, deadline; AAA intended to enforce the non-compete covenant to prevent the CRNAs from working at AGH; and that any of the CRNAs who desired to remain at AGH would be required to buy out their contract with AAA at the equivalent of two years' salary.

¶ 6 On June 3, 2002, thirty-seven CRNA employees of AAA who were then working at AGH filed a Motion to Intervene. The chancellor granted the motion of the CRNA employees to intervene on June 6, 2002. Shortly thereafter, the CRNAs filed a Complaint in Intervention and a Motion for Special and Injunctive Relief. Preliminary objections filed by AAA to the CRNAs' complaint are still pending.

¶ 7 The parties proceeded to the injunction hearing on June 17, 2002, as scheduled. At the conclusion of the hearing, the chancellor issued the following order from the bench:

> And now, to-wit, the 17th day of June 2002, it's hereby ordered and decreed that AAA is preliminarily enjoined from enforcing the covenants not to compete between AAA and its employees, CRNAs only.

N.T. Injunction Hearing, 6/17/02, at 299:17–22. AAA's motion for injunctive relief was denied. The chancellor's decree was docketed in a final order on June 20, 2002, and AAA now appeals the issuance of preliminary injunctive relief in favor of the CRNAs.[2]

1. On May 23, 2002, AGH revised its Motion For Special and Preliminary Injunction and asked the trial court to also enjoin AAA from refusing to provide or substantially curtailing the provision of anesthesiology services through June 30, 2002.

2. Although the appeal is technically from an interlocutory order, a preliminary injunction

¶8 AAA argues that the chancellor erred in issuing the preliminary injunction. Specifically, AAA raises the following issues:

I. The Record Establishes that the CRNAs did not Satisfy any of the Standards for the Issuance of a Preliminary Injunction.

II. Multiple Procedural Irregularities in the Proceedings Below Combined to Contribute Substantially to the Court's Erroneous Preliminary Injunction Ruling.

Brief for Appellant, at i-ii.

## II. STANDARD AND SCOPE OF REVIEW

■■■ ¶9 In reviewing the grant of a preliminary injunction, we are guided by the following principles:

As a preliminary consideration, we recognize that on an appeal from the grant or denial of a preliminary injunction, we do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below. Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the Chancellor.

*Shanaman v. Yellow Cab Co. of Philadelphia*, 491 Pa. 516, 421 A.2d 664, 666 (1980) (citation omitted).

A preliminary injunction should be granted only if all of the following four "essential prerequisites" are proven: (i)

is immediately appealable as of right under Pa.R.A.P. 311(a)(4). *See also* 42 Pa.C.S.A. § 5105(c). Accordingly, this Court has jurisdiction and AAA's appeal is properly before us.

a strong likelihood of success on the merits; (ii) a showing of immediate and irreparable harm that cannot be compensated by money damages; (iii) a showing that greater injury will result if preliminary injunctive relief is denied than if such injunctive relief is granted; and (iv) a showing that a preliminary injunction would restore the status quo.

*Temple University of the Commonwealth System of Higher Education v. Allegheny Health Education and Research Foundation*, 456 Pa.Super. 314, 690 A.2d 712, 718 (1997) (citations omitted).

## III. DISCUSSION

■■■ ¶10 AAA first argues that the CRNAs failed to satisfy the prerequisites for issuance of a preliminary injunction. In order to determine if there were any apparently reasonable grounds for the chancellor's decision to issue the challenged injunction, we shall address the prerequisites seriatim.

■■■ ¶11 The first prerequisite involves the likelihood that the CRNAs would prevail on the merits in an action challenging the enforceability of the non-compete covenant in the CRNA employment contract. The CRNAs maintain that AAA's purported assignment of their contracts to UPMC as well as AAA's effective termination of the CRNAs rendered the non-compete covenant unenforceable. AAA counters that the contracts were never actually assigned and that it never officially terminated the employment of the CRNAs in writing, as is required by the terms of the employment agreement.[3]

3. Paragraph 19(b) of the employment contract provides that "[e]ither party may unilaterally terminate Employee's employment hereunder at any time by delivering a signed and dated written notice of the intention to terminate to the other party at least fifteen

¶ 12 The chancellor rejected both of AAA's arguments, as is clearly evidenced by the following findings of fact entered on the record at the June 17, 2002 hearing:

The fact that these people were terminated and then unterminated, I'm not sure that there is such a term, but that Dr. Weber fired them all at [the May 28, 2002 meeting], there's no doubt in my mind Mr. Falenski's [4] testimony was compelling, asking questions, as I said already, about his COBRA, concerned about his health benefits, concerned about his unemployment. Clearly, there was not an equivocation in anyone's mind who was at the meeting on the 28th [Dr.] Weber intended to fire them [the CRNAs] from AAA and that they could seek employment at Presby.

Now, we have this peculiar binding agreement that's then modified, and I believe that we reached this question in my mind, and I don't care what you call it, these contracts were assigned. Leased. I find these terms, by the way, leasing, et cetera, these are human beings. I'm not sure that we lease human beings, but I suppose that's a possibility in this business, regrettably, but I don't see how you can call it a lease or anything. It's an assignment. The fact that that flies in the face of all case law going back to the late '40s and '50s of our Supreme Court, that assignment of non-competes is not permissible in Pennsylvania, it's frowned upon, and without consent or negotiations for the right to assign, it won't be done.

N.T. Injunction Hearing, 6/17/02, at 289:8–290:11.

 ¶ 13 There is ample support in the record for the chancellor's findings of fact, not the least of which is the testimony of Mr. Falenski and several other CRNAs. We also agree with the chancellor's assessment of the law regarding assignment of employment contracts containing non-compete covenants.

Given that restrictive covenants have been held to impose a restraint on an employee's right to earn a livelihood, they should be construed narrowly; and, absent an explicit assignability provision, courts should be hesitant to read one into the contract. Moreover, the employer, as drafter of the employment contract, is already in the best position to include an assignment clause within the terms of the employment contract.

*All–Pak, Inc. v. Johnston,* 694 A.2d 347, 351 (Pa.Super.1997) (footnotes omitted). Moreover, "an assignment of a right will not be effective if it purports to make a material change in the duties or responsibilities of the obligor, unless the obligor assents to such changes." *Hess v. Gebhard & Co., Inc.,* 570 Pa. 148, 808 A.2d 912, 922 (2002) (quoting *Wilcox v. Regester,* 417 Pa. 475, 207 A.2d 817, 820 (1965)).

¶ 14 The parties agree that the CRNA employment contracts did not contain an assignability provision. AAA, as the employer and drafter of the contract, was certainly in a better position to include such a provision if it so desired. Enforcement of the non-compete covenants would have also materially altered the duties and responsibilities of the CRNAs employed by AAA; indeed, the impetus behind their decision to intervene in the instant action was to prevent AAA from forcing them to discontinue their affiliations with AGH. In light of the foregoing, we find that the chancellor had a reasonable basis to con-

---

(15) days prior to the intended date of termination." CRNA Employment Contract, at 6.

4. Edward Falenski, a CRNA at AGH and an employee of AAA, was one of the intervenors in the instant action and a witness at the June 17, 2002 injunction hearing.

clude that the CRNAs would prevail, on the merits, in an action challenging AAA's right to enforce the non-compete covenants.

■ ¶ 15 Turning next to the second prerequisite for a preliminary injunction, the chancellor found that "the preliminary injunction is necessary to prevent immediate and irreparable harm which cannot be compensated by damages...." Opinion, 8/26/02, at 4. With respect to the CRNAs, the chancellor found that they had an important interest in "being able to earn a living in their chosen profession at the site that they wish to work." N.T. Injunction Hearing, 6/17/02, at 288:10–14 (orally citing *All–Pak,* 694 A.2d at 350). The two CRNAs who testified at the June 17, 2002 injunction hearing offered compelling testimony regarding their desire to continue working at AGH, where they had worked for many years and had built strong working relationships with surgeons and other hospital personnel. *Id.* at 57–58, 87–89. Evidence of record, most notably the CRNA employment agreement, supports the chancellor's finding that the CRNAs were expected to perform their services at AGH and had, in fact, negotiated for that right.[5] Finally, the potential economic harm to the CRNAs was significant since any of them who desired to remain at AGH following the expiration of the AAA–AGH contract would have been required to buy out their contract with AAA at the equivalent of two years' salary.

■ ¶ 16 Harm to the public is an additional consideration in the issuance or denial of a preliminary injunction. *Valley Forge Historical Society v. Washington Memorial Chapel,* 493 Pa. 491, 426 A.2d 1123, 1129 (1981). As the chancellor stated in his opinion, credible testimony at the June 17, 2002, hearing established that, at the time, there was a critical shortage of anesthesia professionals in the national and regional marketplace. *Id.* at 2. There was also evidence that removal of the CRNAs from AGH would have had a serious and detrimental impact on patient services and the work of other physicians at AGH, as well as on the general public welfare. Based upon this evidence, the chancellor rightfully concluded that "[t]he prospect of death, enhanced by injury or serious disruption to the ongoing care of any of the patients at AGH because of the lack of anesthesia care is of paramount importance." Opinion, 8/26/02, at 4. In light of the foregoing, we find ample support in the record for the chancellor's determination that denial of injunctive relief would have caused immediate and irreparable harm to the CRNAs and the public that could not be compensated by damages.

■ ¶ 17 With respect to the third prerequisite for a preliminary injunction, the chancellor found that "[t]here is a risk of greater injury resulting [by] refusing the preliminary injunction than by granting it." Opinion, 8/26/02, at 4. We discussed, *supra,* the potential injuries to the CRNAs and the general public in the absence of injunctive relief. Those factors apply with equal force here and need not be repeated.

¶ 18 With regard to the potential injury to AAA if the injunction were issued, it is clear from the record that there was no such danger. As the chancellor noted,

---

5. Under paragraph 8 of the employment contract, the CRNA employee "agrees to [ ] devote Employee's full working time and best efforts to rendering services on behalf of [AAA] at Allegheny General Hospital ...." CRNA Employment Contract, at 2. Although there is a subsequent provision that arguably supports AAA's argument that it had the right to assign the CRNAs to facilities other than AGH, there is evidence to support the chancellor's finding that virtually all of the CRNAs performed their services exclusively at AGH.

the employer, AAA, has testified that their deal's done [with UPMC], not contingent upon moving these [CRNAs] to the facility, nor will their profits be—their employment be changed in any way, their compensation be changed in any way. So if they were permitted to stay at AGH, they [AAA] would suffer no harm[.]

N.T. Injunction Hearing, 6/17/02, at 291:11–18. The chancellor continued,

I found that there's no economic interest of AAA in remaining—in enforcing these contracts because they have no—they don't lose any money if they don't bring the [CRNAs] with them and they don't make any money on the [CRNAs] if they follow them to UPMC. So the question is what's the financial loss to them [AAA], when I made a particular specific finding of fact which is, I must say, unrebutted that they [AAA] have no financial interest. They suffer no economic loss if they [the CRNAs] work at AGH.

Id. at 293:13–24. Moreover, in his deposition testimony, Dr. Stanley Weber, President of AAA, testified that, for economic reasons, the physician shareholders of AAA were interested in reducing the number of CRNAs directly employed by the company. N.T., Deposition of Stanley Weber, M.D., 6/13/02, at 257:4–13.

¶ 19 Based upon our review of the record, including the evidence offered at the June 17, 2002 hearing, we concur with the chancellor's conclusion that greater injury would have resulted to the CRNAs by refusing to grant the preliminary injunction than would have inured to AAA if the injunction was granted.

¶ 20 The final prerequisite for preliminary injunctive relief is proof that a preliminary injunction would restore the status quo among the parties. "The status quo to be maintained by a preliminary injunction is the last actual, peaceable and lawful noncontested status which preceded the pending controversy." Valley Forge Historical Society, 426 A.2d at 1129 (citation omitted). In this case, the status quo was the continued affiliation of the AAA CRNAs at AGH. By enjoining AAA from enforcing the non-compete covenants in the CRNA employment contracts, the chancellor restored the status quo among the parties to this action.

¶ 21 Having reviewed the record and the arguments of the parties, we find that reasonable grounds existed to support the chancellor's decree granting preliminary injunctive relief in favor of the CRNAs. We turn next to AAA's second and final issue.

¶ 22 AAA argues that multiple procedural irregularities in the proceedings below combined to contribute substantially to what it characterizes as an erroneous preliminary injunction ruling by the chancellor. Specifically, AAA contends that (1) the counterclaim of AGH and the CRNAs' Complaint in Intervention should have been dismissed as premature; (2) the chancellor relied upon erroneous determinations of matters that were beyond the proper scope of the June 17, 2002, hearing; and (3) the chancellor did not consider the full, relevant record. We shall address each of these arguments in the order presented.

¶ 23 The first "procedural irregularity" of which AAA complains is essentially a challenge to the intervention of the CRNAs as parties to the underlying action.[6] "It is well established that a 'question of intervention is a matter within

---

6. We need not address AAA's argument that AGH's counterclaim and the CRNAs' Complaint in Intervention, both of which sought relief in the form of a declaratory judgment, should have been dismissed as premature. The court below has not ruled upon AAA's

the sound discretion of the court below and unless there is a manifest abuse of such discretion, its exercise will not be interfered with on review.'" *Wilson v. State Farm Mutual Automobile Ins. Co.*, 512 Pa. 486, 517 A.2d 944, 947 (1986) (quoting *Darlington v. Reilly*, 363 Pa. 72, 69 A.2d 84, 86 (1949)). In ruling upon a motion to intervene, a court must consider the following factors set forth in Pennsylvania Rule of Civil Procedure 2327:

At any time during the pendency of an action, a person not a party thereto shall be permitted to intervene therein, subject to these rules if

(1) the entry of a judgment in such action or the satisfaction of such judgment will impose any liability upon such person to indemnify in whole or in part the party against whom judgment may be entered; or

(2) such person is so situated as to be adversely affected by a distribution or other disposition of property in the custody of the court or of an officer thereof; or

(3) such person could have joined as an original party in the action or could have been joined therein; or

(4) the determination of such action may affect any legally enforceable interest of such person whether or not such person may be bound by a judgment in the action.

Pa.R.C.P. 2327.

¶ 24 In our view, the CRNAs qualified for intervention under subsections (3) and (4) above. Any of the CRNAs could have joined, or could have been joined as, an original party in the action since each of them was a signatory to the employment agreement containing the disputed non-compete covenant. Further, any determination in an action regarding the enforceability of the non-compete covenant would necessarily have affected the legally enforceable interest of each CRNA to continue his or her affiliation with AGH. We hasten to add that, if the non-compete covenant were to be upheld, the CRNAs had been warned that any of them desiring to remain at AGH would have been required to buy out their contract with AAA at the equivalent of two years' salary. We find that the CRNAs fulfilled the criteria set forth in Pa.R.C.P. 2327 and, additionally, complied with the pleading requirements enumerated in Pa.R.C.P. 2328.[7] Therefore, we decline to interfere with the sound discretion of the chancellor in granting the CRNAs' motion to intervene.

¶ 25 AAA next argues that the chancellor relied upon erroneous determinations of matters that were beyond the proper scope of the June 17, 2002, hearing. AAA insists that, based upon the chancellor's prior indications and the status of the case, the scope of the hearing was intended to be limited to the question of whether the CRNAs' non-compete obligations were unenforceable on public interest grounds. AAA provides no support for its assertion

preliminary objections, and the only issue before us in this appeal is the propriety of the chancellor's equitable decree granting preliminary injunctive relief in favor of the CRNAs.

7. Rule 2328 provides, in pertinent part, that "[a]pplication for leave to intervene shall be made by a petition in the form of and verified in the manner of a plaintiff's initial pleading in a civil action, setting forth the ground on which intervention is sought and a statement of the relief or the defense which the petitioner desires to demand or assert. The petitioner shall attach to the petition a copy of any pleading which the petitioner will file in the action if permitted to intervene or shall state in the petition that the petitioner adopts by reference in whole or in part certain named pleadings or parts of pleadings already filed in the action." Pa.R.C.P. 2328.

and our own review of the record has revealed no official order or agreement of the parties regarding the scope of the injunction hearing.

¶ 26 In any event, at the commencement of the hearing the chancellor specifically disavowed any limitation on the scope of the proceedings.[8] Even a cursory review of the hearing transcript reveals that, in addition to the aforementioned public interest issue, issues were raised and argued related to whether AAA had terminated the CRNAs and/or assigned their employment contracts. Counsel for AAA, in fact, raised both of these issues in his opening statement. Consideration and analysis of the termination and assignment issues was also vitally important to the chancellor's ultimate determination. As we discussed in our analysis of AAA's first issue, *supra*, the chancellor was required to consider all of the aforementioned issues in deciding whether the CRNAs had satisfied the legal requirements for issuance of a preliminary injunction. To have limited the scope of the hearing to presentation of evidence on only one of those requirements would have been an absurd waste of judicial resources and would have precluded the party seeking the preliminary injunction from demonstrating its entitlement to relief. *Temple University*, 690 A.2d at 718 (preliminary injunction appropriate only if all four essential prerequisites are proven).

¶ 27 Finally, AAA contends that the chancellor, in making his ruling from the bench at the conclusion of the injunction hearing, failed to consider the full record which the parties had stipulated would include the transcripts of numerous depositions and accompanying exhibits. AAA provides no support for this bald allegation other than commentary regarding the voluminous nature of the record. AAA's assertion is also belied by an agreement among the parties and the chancellor "that we were going to stand on oral arguments here this afternoon and I was going to make a ruling from the bench." N.T. Injunction Hearing, 6/17/02, at 286:24–287:2. AAA's final argument fails.

## IV. CONCLUSION

¶ 28 In this appeal from the grant of a preliminary injunction in favor of appellees, CRNAs, we have thoroughly reviewed the record and arguments of the parties and find that there were reasonable grounds for the chancellor's action. We also find no merit to appellant, AAA's, arguments regarding alleged procedural irregularities in the proceedings below. Accordingly, the order of the chancellor is affirmed.

¶ 29 Order affirmed.

---

**8.** At the outset of the injunction hearing, the chancellor stated: "The only question is the scope of what we're doing here. And I don't see it as being such a narrow matter, and unless I'm shown some harm, we'll deal with that as we go along." N.T. Injunction Hearing, 6/17/02, at 22:21–24. The chancellor went on to indicate his willingness to accommodate counsel's need for presentation of evidence, if necessary: "People are being deposed. These are AAA employees that he now claims he doesn't know what's up with them. He hasn't had a chance to depose them all. But we'll see what's going on. I'll allow some latitude on that. If there's prejudice or if we have to stop, somebody has to be deposed or brought in, I can deal with that." *Id.* at 22:25–23:7.