J-S35031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| BLOSSOM MEDSPA, LLC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| BLUME MEDSPA LLC AND REBEKAH | : | No. 556 MDA 2025 |
| AND DUSTIN RAYSOR | : | |

Appeal from the Order Entered March 28, 2025
In the Court of Common Pleas of Lancaster County Civil Division at
No(s): CI-25-00622

BEFORE: OLSON, J., MURRAY, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED: JANUARY 14, 2026**

Blossom MedSpa, LLC ("Blossom") appeals from the order which denied its emergency motion for special injunction against defendants Blume MedSpa LLC ("Blume") and its owners, Rebekah Raysor ("Rebekah") and Dustin Raysor ("Dustin") (collectively "the Raysors"), and granted, in part, Blossom's motion for contempt against defendants by finding Rebekah to be in contempt, but imposing no further penalty.[1]  We affirm.

The trial court set forth the relevant factual and procedural history, as follows:

---

[1] Although the action remains pending in the trial court and there is no final order, an appeal may be taken as of right from an order denying injunctive relief.  *See* Pa.R.A.P. 311(a)(4) (providing that an appeal may be taken as of right from "[a]n order that grants or denies, modifies or refuses to modify, continues or refuses to continue, or dissolves or refuses to dissolve an injunction").

Blossom . . . is owned by Alyssa Licatese [("Alyssa")] and has been operating as a medical spa in Lancaster County since 2013 with a staff of approximately [twelve] people. Blossom offers a variety of services to customers including Botox injections, beauty aids, fillers, products, and other injectables. The business, which advertises extensively through social media platforms, has 6,000 followers on Instagram and 5,000 followers on Facebook; all of whom are public. As public sites, anyone visiting the platform can see and contact Blossom's followers. While Blossom's followers are public, the services its customers receive are contained in Blossom's confidential records.

Blossom hired [Rebekah], a nurse injector/laser technician, in June 2021, to perform injections and laser services. As part of her employment, [Rebekah] was expected to market herself on her own social media platforms, which she did. Employees used both a Blossom iPad and their personal devices to book clients and also to take photos. This information was to be uploaded to Blossom's confidential customer files. By the time of her termination, [Rebekah] was servicing approximately 600 clients.

In early 2023, Blossom lost a number of employees who left Blossom and started a new medspa named Aesthetix Lounge. To prevent employees from working with Aesthetix, [Alyssa] decided to create employment agreements for her employees to sign. Rather than engage the services of an attorney, [Alyssa] used a web-based application called Rocket Lawyer to draft an employee agreement. In June 2023, in exchange for additional compensation, [Rebekah] signed the employment agreement drafted by [Alyssa]. The agreement contained restrictive covenants, including non-compete, non-solicitation, and confidentiality clauses.

In April 2024, [the Raysors] pursued the acquisition of Blossom, signing a non-disclosure agreement also drafted by Rocket Lawyer ("NDA") on April 8, 2024, to facilitate access to sensitive proprietary information. [The parties also drafted a proposed asset purchase agreement which valued the good will of Blossom at $300,000.] However, after months of due diligence, on October 18, 2024, [the Raysors] decided against moving ahead with the purchase. During the half-year time period from April 2024 through October 2024, [Alyssa] instructed [Rebekah] to take a management role in the business as she contemplated the purchase. After [Rebekah] told [Alyssa] she was not going to

purchase Blossom, [Alyssa] closed [Rebekah's] access to all confidential information but maintained her as an employee.

Following the failed acquisition, [Alyssa] testified that [Rebekah] engaged in activities that contravene[d] her contractual obligations as an employee and the NDA. These activities included: the registration of a competing entity, Blume . . ., while employed at Blossom, opening Blume in 2025 within [ten] miles of Blossom, the direct solicitation of Blossom['s] clientele, the unauthorized use of Blossom['s] confidential information and proprietary imagery for the promotion of Blume, and the disclosure of confidential business strategies and financial data. [Alyssa] also testified to activities [Rebekah] undertook as an employee that [Alyssa] felt undermined Blossom's business such as attending "unapproved" beauty boost events and initiating give aways for services that [Alyssa] did not approve. Also, during this time period, [Alyssa] noticed that [Rebekah] was booking fewer clients, and by late October, [Alyssa] came to believe [Rebekah] was planning to open her own medspa. Despite these concerns, [Alyssa] did not terminate [Rebekah] until December 28, 2024, when [Alyssa] sent [Rebekah] a text ending [her] employment.

[Rebekah] registered Blume on October 23, 2024, while still working as an employee of Blossom. After [Alyssa] terminated her, [Rebekah] began advertising for her business, Blume. In late January 2025, [Rebekah] opened Blume less than three miles from Blossom's location.

Blossom presented evidence that the loss of [Rebekah] as an employee and her continuing work within a [ten]-mile radius has resulted in financial harm, including client attrition of approximately 25% and revenue loss. Despite the issuance of cease-and-desist letters, the [Raysors] have continued to operate Blume.

During [their] testimony, [the Raysors] denied any misappropriation of confidential information, stating that any such information was returned or disclosed to [Blossom]. Both [of the Raysors] testified that in compliance with the court's January 30, 2025, order concerning [Blossom's] emergency motion for special injunction, they conducted a search for any information deemed "property, trade secrets and confidential or proprietary information belonging to plaintiff." The information located was

subsequently provided to [Blossom's] counsel via a letter dated February 3, 2025.

[Rebekah] explained in her testimony that she used a [Blossom]-owned iPad during her employment, which was returned upon her termination. She also testified that she was instructed by [Alyssa] to use her personal smartphone for employment-related communications. [Rebekah] conducted a search of her smartphone and disclosed any relevant information to [Blossom's] counsel in a letter dated February 12, 2025. It became evident at the hearing that there was some confusion on the part of [the Raysors] regarding information Blossom believed to be proprietary. In addition to receiving notice to return all proprietary information, [the Raysors] were also instructed to preserve all information. Both [Rebekah and Dustin] Raysor testified that they have preserved photos and email while also providing copies of them to [Blossom].

[The Raysors] acknowledge the registration of Blume . . . in October 2024[,] but deny that it constituted a breach of any agreement and deny soliciting clients or engaging in unfair competition. Additionally, the [Raysors] deny utilizing Blossom's proprietary information.

\* \* \* \*

On January 30, 2025, . . . Blossom . . . initiated these proceedings by providing notice of the filed complaint to defendants through electronic mail, directed to the defendants' attorneys, with whom prior correspondence had occurred. A copy of the complaint was attached to the electronic mail notification. Blossom . . . allege[d, *inter alia*, state law claims for] breach of contract, misappropriation of confidential information, . . . unfair competition[, as well as certain federal claims].

On the same day, [Blossom] notified defendants via electronic mail of the scheduled presentation of the emergency motion for special injunction . . .. [In the motion, Blossom sought an injunction against the defendants to: (1) restrain Rebekah from violating non-competition and non- disclosure covenants outlined in her employment agreement with Blossom; (2) restrain the Raysors from breaching their [NDA] with Blossom; and (3) enjoin Blume from operating a business within a ten-mile radius of Blossom's principal place of business.] The court scheduled a

- 4 -

conference with counsel that same afternoon. [Blossom's] counsel attended this conference, but defendants' counsel never appeared.

The [Raysors] had received written notice and were given the opportunity to be heard. Nevertheless, neither [the Raysors] nor their counsel appeared at the scheduled presentation of the emergency motion to the court. Furthermore, the [Raysors] did not respond or communicate with [Blossom's] counsel regarding the case before the issuance of the injunction, nor did they seek to oppose the emergency motion. Consequently, the court conducted the scheduled presentation on the injunction and the court issued [a preliminary] injunction on January 30, 2025, which became immediately binding upon defendants.

The [preliminary] injunction stipulated that a hearing on the merits of the motion would be held within five days of the order. The court issued a subsequent order scheduling a preliminary injunction hearing for February 4, 2025. [Blossom's] counsel provided [the Raysors] with a copy of the injunction on January 30, 2025, via electronic mail.

Defendants did not respond to correspondence or phone calls from [Blossom's] counsel nor did they file any application to oppose the emergency motion or to dissolve or modify the injunction. On February 3, 2025, defendants filed a notice removing the matter to the United States District Court for the Eastern District of Pennsylvania. Defendants attached copies of the complaint, the emergency motion for special injunction, and the injunction to their notice of removal.

By letter dated February 3, 2025, defendants' attorneys confirmed their representation of defendants and the filing of the notice of removal to the United States District Court. In a separate letter dated February 3, 2025, defendants' counsel acknowledged receipt of [Blossom's] emails dated January 30, 2025, and the court's order of the same date, granting [Blossom's] emergency motion for special injunction.

On February 3, 2025, the court cancelled the scheduled preliminary injunction hearing following the defendants' notice of removal, as the court no longer had jurisdiction over the matter. On February 5, 2025, the case was transferred to the United States District Court for the Eastern District of Pennsylvania.

- 5 -

However, the case was remanded back to this court on February 13, 2025, after [Blossom] filed an amended complaint removing their federal claim[s].

On February 14, 2025, [Blossom] filed a motion for contempt. [Therein, Blossom requested that the trial court find all defendants in contempt of the January 30, 2025 preliminary injunction order, and impose sanctions, including a full accounting, disgorgement, and payment to Blossom of all revenues or proceeds generated or received by defendants for actions in violation of the injunction, reimbursement of all costs, including reasonable attorneys' fees, incurred by Blossom in seeking enforcement of the order.] On February 18, 2025, the court scheduled a hearing for February 26, 2025, to address both the issues of the emergency motion for special injunction and the motion for contempt. The court held the hearing on February 26, 2025; but as the parties were unable to present their evidence within the time allotted, continued the hearing for an additional . . . day, on March 21, 2025.

Trial Court Opinion, 3/28/25, at 1-6 (unnecessary capitalization omitted).

On March 21, 2025, the trial court entered an order vacating the January 30, 2025 preliminary injunction order. One week later, on March 28, 2025, the trial court entered an order in which it denied Blossom's emergency motion for special injunction against Blume, Rebekah, and Dustin, and granted Blossom's motion for contempt, in part, by finding Rebekah in contempt, but imposing no further penalty against her. Blossom filed a timely notice of appeal and both it and the trial court complied with Pa.R.A.P. 1925.[2]

Blossom raises the following issues for our review:

---

[2] In lieu of authoring an opinion pursuant to Rule 1925(a), the trial court directed this Court to the reasoning provided in its opinion and order dated March 28, 2025. **See** Pa.R.A.P. 1925(a)(1).

A. Whether the trial court erred in its interpretation of the employment agreement, specifically regarding the language of the non-competition covenant.

B. Whether the trial court erred in holding that the evidence adduced to date is insufficient to establish a likelihood of success on the merits regarding defendants' alleged violations of the [NDA].

C. Whether the trial court erred in finding that sufficient evidence has not been submitted to date to demonstrate that defendants are presently soliciting confidential clients of Blossom or that defendants are using the confidential information of Blossom.

D. Whether the trial court erred in finding that testimony at the hearing establishes that monetary damages could adequately compensate Blossom in the event a jury finds defendants acted in violation of their contractual duties or in violation of Pennsylvania law causing an erosion of Blossom's good will.

E. Whether the trial court erred in failing to find . . . Blume . . . in contempt of its January 30, 2025, order.

F. Whether the trial court erred in failing to assess a penalty upon its finding . . . Rebekah . . . in contempt of its January 30, 2025, order.

Blossom's Brief at 4-5 (unnecessary capitalization omitted).

Blossom's first four issues present a challenge to the trial court's ruling on its emergency motion for special injunction. Our standard of review of a trial court's order granting or denying preliminary injunctive relief is "highly deferential." **Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount Inc.**, 828 A.2d 995, 1000 (Pa. 2003). This "highly deferential" standard of review requires that in reviewing the grant or denial of a preliminary injunction, an appellate court is directed to "examine the record to determine if there were **any apparently reasonable grounds** for the action of the court

below." *Id*. (emphasis added). In making this determination, we do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below. *See id*. Only if it is plain that *no grounds* exist to support the decree, or that the rule of law relied upon was palpably erroneous or misapplied, will we interfere with the decision of the trial court. *See id*. We will find that a trial court had "apparently reasonable grounds" for its denial of injunctive relief where the trial court has properly found "that any one of [the six] 'essential prerequisites' for a preliminary injunction is not satisfied." *Id*. at 1002.

In this regard, the six "essential prerequisites" that a party must establish prior to obtaining preliminary injunctive relief are as follows: (1) "that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages;" (2) "that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings;" (3) "that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct;" (4) "that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits;" (5) "that the injunction it seeks is reasonably suited to abate the offending activity;"

and (6) "that a preliminary injunction will not adversely affect the public interest." **Id**. The burden is on the party who requested preliminary injunctive relief to prove all six of these essential prerequisites, and if the petitioner fails to establish any one of them, there is no need to address the others. **See id**. at 1001.

In the instant matter, the trial court denied injunctive relief because it determined that Blossom failed to prove two of the essential prerequisites: (1) "that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages;" and (4) "that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits." **See** Trial Court Opinion, 3/28/25, at 10-14. Accordingly, the trial court did not consider the remaining essential prerequisites.

In its first issue, Blossom challenges the trial court's determination that it failed to prove that it was likely to prevail on the merits of its claim that Rebekah violated the non-competition provision included in her employment contract. Blossom contends that the trial court misconstrued the non-competition provision in the employment contract. With respect to claims involving contract interpretation, such matters present a question of law. **See** **Gillard v. Martin**, 13 A.3d 482, 487 (Pa. Super. 2010).

Furthermore,

> Contract interpretation . . . requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement. Courts assume that a contract's language is chosen carefully and that the parties are mindful of the meaning of the language used. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

*Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 957 (Pa. Super. 2011) (citations omitted).

Non-competition agreements are generally disfavored in Pennsylvania as they constitute a restraint on trade that also undercuts a former employee's ability to earn a living. *See Hess v. Gebhard & Co.*, 808 A.2d 912, 916 (Pa. 2002). That principle is tempered to some degree by the recognition that, in the modern business environment, such covenants can be important business tools which prevent individuals from learning employers' trade secrets, befriending their customers, and then moving into competition with them. *See id*. at 918.

Nonetheless, given that restrictive covenants have been held to impose a restraint on an employee's right to earn a livelihood, they should be construed narrowly. *See Allegheny Anesthesiology Assocs. v. Allegheny Gen. Hosp.*, 826 A.2d 886, 892 (Pa. Super. 2003). In construing a non-competition covenant, courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. *See Synthes USA Sales, LLC v. Harrison*, 83 A.3d 242, 250 (Pa. Super. 2013). When a non-competition

provision is clear and unequivocal, its meaning must be determined by its contents alone. *See id*. It is not the function of a court to re-write it, or to give it a construction in conflict with the accepted and plain meaning of the language used. *See id*. at 250-51.

The non-competition provision of the employment agreement executed by Rebekah provides as follows:

> NON-COMPETE AGREEMENT. Rebekah Raysor recognizes that the various items of Information re special and unique assets of the company and need to be protected from improper disclosure. In consideration of the disclosure of the Information to Rebekah Raysor, Rebekah Raysor agrees and covenants that during his or her employment by Blossom Med Spa LLC and for a period of 1 Year following the termination of Rebekah Raysor's employment, whether such termination is voluntary or involuntary, Rebekah Raysor will not directly or indirectly engage or do business with the following competitor(s):
>
>    - Aesthetix Lounge
>
> Any of the same services performed at Blossom
>
> This covenant shall apply to the geographical area that includes the area within a 10 Miles-mile radius of Blossom Med Spa. Directly or indirectly engaging in any competitive business includes, but is not limited to:
>
> (i) engaging in a business as owner, partner, or agent, (ii) becoming an employee of any third party that is engaged in such business, (iii) becoming interested directly or indirectly in any such business, or (iv) soliciting any customer of Blossom Med Spa LLC for the benefit of a third party that is engaged in such business. Rebekah agrees that this non-compete provision will not adversely affect Rebekah Raysor's livelihood.

Employment Contract, 6/28/23, at 3.

Blossom argues that the trial court erred in construing the non-competition provision to prohibit Rebekah from working with or for Aesthetix Lounge within a ten-mile radius of Blossom for a period of one year. Blossom contends that "the non-competition provision of the employment agreement unambiguously prohibits Rebekah . . . from competing with Blossom by partnering with Aesthetix Lounge or by engaging in any of the same services provided by Blossom within a 10-mile radius of Blossom's principal place of business." Blossom's Brief at 35-36 (unnecessary capitalization omitted).[3] Blossom submits that the trial court's interpretation of the non-competition provision "is an erroneous and implausible reading of the language agreed to by the parties when they executed the agreement." *Id*. at 41 (unnecessary capitalization omitted). Blossom asserts that it offered the credible and unrebutted testimony of Alyssa that the non-competition provision was "to

_____

[3] Notwithstanding Blossom's assertion that the non-competition clause is unambiguous, it nevertheless purports to argue in the alternative that the clause is ambiguous, and that the trial court erred by failing to conduct an inquiry into whether the clause is ambiguous. *See* Blossom's Brief at 35. However, as the trial court noted, **both** "parties believe the language . . . is **unambiguous**." Trial Court Opinion, 3/28/25, at 12 (emphasis added). Thus, as Blossom did not raise any ambiguity challenge in the court below, it has waived any argument on appeal that the clause is ambiguous or that the trial court failed to conduct an inquiry into whether the clause is ambiguous. *See* Pa.R.A.P. 302(a) (providing that issues not raised in the trial court are waived and cannot be raised for the first time on appeal). Moreover, the trial court went on to explain that it "agreed the language is not ambiguous as written." Trial Court Opinion, 3/28/25, at 12. Accordingly, even if not waived, the record reflects that the trial court conducted an independent assessment as to whether it believed that the clause was ambiguous. *See id*.

both prevent any contracted employee who leaves Blossom from partnering with Aesthetix *and* the performance of any covered services within a 10-mile radius of Blossom." *Id*. at 41 (emphasis in original).

The trial court considered Blossom's first issue and determined that it lacked merit. The court reasoned:

> The court may apply the "last antecedent rule in construing statutes and contracts: [T]he grammatical 'rule of the last antecedent,' according to which a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.["] *Rendell v. Pa. State Ethics Comm'n*, 983 A.2d 708, 715 (Pa. 2009). The non-compete paragraph clearly states that that [Rebekah] may not "directly or indirectly engage or do business with Aesthetix Lounge." The next sentence following the prohibition on doing business with Aesthetix Lounge states, "Any of the same services performed at Blossom." The logical reading of this next sentence is that it provides further detail of what is specifically prohibited work with Aesthetix Lounge.
>
> The next paragraph of the non-compete identifies a 10-mile radius of Blossom. The paragraph then explains what "directly or indirectly engaging" with a competitor means, providing a definition from the first paragraph's prohibition of "directly or indirectly engage or do business with . . . Aesthetix Lounge."
>
> This restrictive agreement must be strictly construed against Blossom. Accordingly, the court finds that the non-compete agreement of [Rebekah] is limited to working for or with Aesthetix Lounge within a 10-mile radius of Blossom.

Trial Court Opinion, 3/28/25, at 12-13 (unnecessary capitalization omitted).

Based on our review, we conclude that there were apparently reasonable grounds for the actions of the trial court in construing the terms of the non-competition provision. As explained above, in making this determination, we do not inquire into the merits of the controversy. *See*

- 13 -

*Summit Towne Centre, Inc.*, 828 A.2d at 1000. Rather, we merely examine the record to determine if there were any apparently reasonable grounds for the action of the court below. *See id*. We may not interfere with the decision of the trial court unless it is plain that *no grounds* exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied. *See id*.

Here, the record provides apparently reasonable grounds for the trial court's determination that the language of the non-competition provision was unambiguous. As such, the court was not permitted to consider the testimony provided by Alyssa as to what she hoped or intended to achieve by obtaining the subject employment agreement from Rocket Lawyer and asking Rebekah to sign it. *See Braun*, 24 A.3d at 957 (providing that when a writing is clear and unequivocal, its meaning must be determined solely by its contents). Instead, the trial court was limited to narrowly construing the terms of the non-competition provision *as embodied in the written agreement*. *See id*.; *see also Synthes USA Sales, LLC*, 83 A.3d at 250; *Allegheny Anesthesiology Assocs.*, 826 A.2d at 892.

To that end, an apparently reasonable and narrow reading of the provision in question prohibited Rebekah from "directly or indirectly engag[ing] or do[ing] business with . . . Aesthetix Lounge [by performing] any of the same services performed at Blossom [either directly or indirectly for Aesthetix Lounge]." Employment Contract, 6/28/23, at 3 (unnecessary

capitalization omitted). It was not the function of the trial court to re-write the unambiguous terms of the non-competition provision, or to give the provision a construction which conflicts with the accepted and plain meaning of the language used by the parties. *See Synthes USA Sales, LLC*, 83 A.3d at 250-51. Accordingly, as the record provides apparently reasonable grounds for the trial court's determination that Blossom failed to prove that it was likely to prevail on the merits of its claim that Rebekah breached the terms of the non-competition provision, we conclude that Blossom's first issue merits no relief.

In its second issue, Blossom challenges the trial court's determination that it failed to prove that it was likely to prevail on the merits of its claim that the Raysors violated the NDA by disclosing confidential information. In advancing this argument, Blossom cites to the definition of "confidential information" in the NDA which provides: "information provided by [Blossom] concerning the business, technology and information of [Blossom] and any third party with which [Blossom] deals, including, without limitation, business records and plans, trade secrets, technical data, product ideas, contracts, financial information, pricing structure, discounts, computer programs and listings, source code and/or object code, copyrights and intellectual property, inventions, sales leads, strategic alliances, partners, and customer and client lists." NDA, 4/8/24, at 1.

Blossom points out that Rebekah acknowledged that she still had contact information and treatment photos for Blossom clients on her cell phone. Blossom acknowledges that the Raysors testified that they did not return certain information and documents to Blossom because they believed that they were required to preserve the information and documents during the pending litigation. However, Blossom insists that the Raysors' testimony in this regard was not credible, and the trial court's reliance on this testimony was therefore misplaced. On this basis, Blossom asserts that it proved that it was likely to prevail on its claim that the Raysors breached the NDA.

The trial court considered Blossom's second issue and determined that it lacked merit. The court reasoned that Blossom failed to prove that it was likely to prevail on its claim that the Raysors breached the NDA because: (1) the Raysors testified as to their belief that they were required to preserve the information and documents; and (2) Blossom presented no evidence or testimony that the Raysors disclosed the information or documents to anyone. *See* Trial Court Opinion, 3/28/25, at 13. As the trial court explained:

> [The Raysors] do not contest the fact that they are bound by the [NDA]. The court is not convinced by the evidence at this stage of the litigation that [Blossom] is likely to prevail on the merits that [the Raysors] breached the NDA. While certain documents remain in the possession of [the Raysors] under a belief, either mistaken or otherwise, that they are required to preserve the documents, there is no evidence that any such information is being used by [Rebekah] in her current employment.

*Id*. (unnecessary capitalization omitted).

- 16 -

Once again, based on our examination of the record, we conclude that there were apparently reasonable grounds for the actions of the trial court in determining that Blossom failed to prove that it was likely to prevail on the merits of its claim that the Raysors violated the NDA. While Rebekah admitted that she still had contact information and treatment photos for Blossom clients on her cell phone, the Raysors testified that they believed that they were required to retain such information during to the pendency of the litigation. **See** Trial Court Opinion, 3/28/25, at 4. Indeed, the trial court explained that "[the Raysors] were also **instructed to preserve all information**." **Id**.

Moreover, the record reflects that Blossom presented **no** evidence or testimony that the Raysors disclosed any confidential information or documentation to anyone in violation of the terms of the NDA. Accordingly, as the record provides apparently reasonable grounds for the trial court's determination that Blossom failed to prove that it was likely to prevail on the merits of its claim that the Raysors breached the terms of the NDA, we conclude that Blossom's second issue merits no relief.

In its third issue, Blossom challenges the trial court's determination that it failed to prove that it was likely to prevail on the merits of its claim that the Raysors are actively soliciting confidential clients of Blossom or using confidential information of Blossom. Specifically, Blossom argues that the trial court misconstrued the testimony and evidence presented regarding Blossom's protectible business interest in its client lists and social media

accounts. According to Blossom, "the trial court seems to conflate Blossom's concern for defendants' contacting its customers (many of whom are among its public social media 'followers') with its thousands of followers." Blossoms' Brief at 45. Blossom explains that its concern is not with its list of followers, but rather with the client names that are among them.

Blossom also challenges the trial court's finding that no evidence was submitted that the Raysors are presently soliciting confidential clients of Blossom. According to Blossom, the Raysors improperly gathered and continued to possess Blossom's confidential information in violation of their contractual obligations. Blossom points out that Rebekah admitted that she had contact information and treatment photos of Blossom clients on her cell phone during her employment and after the termination of her employment and never took steps to remove such confidential proprietary information of Blossom. Blossom further points out that Rebekah admitted that she took screen shots with her cell phone of a list of Blossom's clients that she was serving while employed at Blossom, and stored on her cell phone copies of certain text messages that she exchanged with Blossom's clients.

The trial court considered Blossom's third issue and determined that it lacked merit. The court reasoned:

> The court is also not convinced by the evidence that most of Blossom's clients are confidential. [Alyssa] testified that all of Blossom's social media accounts are public. Therefore, anyone can see who the followers of Blossom are and can contact them through social media. Furthermore, no evidence was submitted that defendants are presently soliciting confidential clients of

- 18 -

Blossom. . . . There is not adequate evidence for the court to find by a preponderance of the evidence that defendants are using the confidential information of [Blossom].

Trial Court Opinion, 3/28/25, at 13-14 (unnecessary capitalization omitted).

Based on our review, we conclude that there were apparently reasonable grounds for the trial court's determination that Blossom failed to prove that it was likely to prevail on the merits of its claim that the Raysors are presently soliciting confidential clients of Blossom or that they are otherwise using the confidential information of Blossom. As the trial court pointed out, Blossom "advertises extensively through social media platforms, has 6,000 followers on Instagram and 5,000 followers on Facebook; all of whom are public. As public sites, anyone visiting the platform can see and contact Blossom's followers." *Id*. at 2. As Blossom concedes that many of its clients are following Blossom on its public Instagram and public Facebook pages, their identity is not confidential information. *See Hess*, 808 A.2d at 924 (holding that, if the information the employer seeks to keep confidential could be obtained by legitimate means by its competitors, enforcement of the covenant on that basis is not appropriate); *see also Carl A. Colteryahn Dairy v. Schneider Dairy*, 203 A.2d 469, 473 (Pa. 1964) (stating that "equity will not protect mere names and addresses easily ascertainable by observation or reference to directories").

Moreover, the mere fact that Rebekah retained certain client contact information and treatment photos on her cell phone, albeit under a belief that

she was required to preserve such information during the pendency of this litigation, is not evidence that she or Dustin used such information to solicit Blossom clients or otherwise promote their new business. To that end, Blossom presented *no* evidence of any such conduct by the Raysors. As such, the record provides apparently reasonable grounds for the trial court's determination that Blossom failed to prove that it was likely to prevail on the merits of its claim that the Raysors are presently soliciting confidential clients of Blossom or that they are otherwise using the confidential information of Blossom. Accordingly, Blossom's third issue merits no relief.

In its fourth issue, Blossom challenges the trial court's determination that they failed to establish the first essential prerequisite for a preliminary injunction because monetary damages could adequately compensate Blossom in the event that a jury finds that the Raysors acted in violation of their contractual duties. Blossom acknowledges that the parties' valued Blossom's good will at $300,000 in the asset purchase agreement, and that the trial court relied on this valuation to conclude that any subsequent loss of that good will could be adequately compensated with money damages. However, Blossom asserts that the trial court abused its discretion by not considering record evidence showing that Blossom had non-economic value, which includes good market share and a client base. Specifically, Blossom points to Rebekah's lay testimony wherein she agreed that client loss is difficult for businesses to recover from and that negative information about a business

could hurt its reputation. Blossom maintains that these statements by Rebekah support a finding that conduct disrupting a business' market share, client base, and reputation interferes with good will, causing unquantifiable damage.

Blossom further argues that the trial court erred by relying on the parties' good will valuation in the asset purchase agreement without considering the contract holistically. According to Blossom, the trial court failed to consider section 8.1 of the agreement, which imposed a non-competition covenant on Alyssa following the proposed sale of Blossom to the Raysors. The parties agreed that any breach of the non-competition provision would cause the Raysors substantial and irreparable harm for which an award of money damages would be inadequate. Blossom insists that this language showed that the parties did not consider money adequate to remedy any destruction of its good will.

Finally, Blossom contends that the parties' placement of a dollar value on Blossom's good will did not prevent Blossom from suffering an unquantifiable harm due to destruction of that good will. In support, Blossom cites to: ***John G. Bryant Co., Inc. v. Sling Testing & Repair Inc.***, 369 A.2d 1164, 1168 (Pa. 1977) (wherein our High Court upheld a preliminary injunction imposed after a former employee violated a non-competition agreement which prohibited him from selling directly to his former employer's established customers, and the injunction was necessary based on the threat

of the unbridled continuation of the violation and the resultant incalculable damage to the former employer's business); and ***Geisinger Clinic v. Di Cuccio***, 606 A.2d 509, 518 (Pa. Super. 1992) (holding that, where the defendant doctor untimely terminated his employment relationship with Geisinger and established a competing medical practice within the prohibited temporal and geographic bounds of the restrictive covenant, the waiver payment provision of the non-competition clause of the subject employment agreement represented a valid liquidated damages clause, rather than a penalty, designed to protect the purchaser of physical assets and good will). Based on ***Di Cuccio***, Blossom submits that if placing monetary value on a company's intact good will does not preclude a buyer from showing it was irreparably harmed by a seller's interference, that same dollar value cannot preclude an employer from showing irreparable harm arising from a former employee's interference. Accordingly, Blossom submits that the trial court erred in holding that it failed to show irreparable harm that cannot be adequately compensated through monetary damages.

The trial court considered Blossom's fourth issue and determined that it lacked merit. The court reasoned that "much of the client contact of which [Blossom] complains occurred during the last quarter of 2024 and January 2025" and that "if anything done by [Rebekah] is found to be improper by a jury, the wrongs would be compensable through money damages." Trial Court

Opinion, 3/28/25, at 13 (unnecessary capitalization omitted). As the trial explained:

> [Calogero] Licatese [("Mr. Licatese")], who keeps the books for his wife, testified that Blossom can calculate the monetary damages of the termination of [Rebekah] quite accurately. [Blossom] also presented evidence that during the contemplated sale of Blossom to the [Raysors], the parties arrived at a value for good will. This testimony establishes that should a jury find [that the Raysors] acted in violation of their contractual duties or in violation of Pennsylvania law causing an erosion of the good will of Blossom, the jury could enter an award of money damages adequately compensating Blossom for its losses.

*Id*. at 10.

Based on our review, we conclude that Blossom's fourth issue merits no relief. Initially, we note that because the trial court found that Blossom failed to establish the fourth essential prerequisite with respect to Blossom's request for a preliminary injunction, the court was not required to consider any other essential prerequisite, including whether monetary damages could adequately compensate Blossom. *See Summit Towne Centre, Inc.*, 828 A.2d at 1001.

Moreover, we conclude that the record provides apparently reasonable grounds for the trial court's determination that monetary damages could adequately compensate Blossom in the event that a jury finds that the Raysors acted in violation of their contractual duties. As explained above, in making this determination, we do not inquire into the merits of the controversy. *See Summit Towne Centre, Inc.*, 828 A.2d at 1000. Rather, we merely examine the record to determine if there were any apparently reasonable grounds for the action of the court below. *See id*.

- 23 -

Here, the parties agreed to a valuation of Blossom's good will at $300,000. This fact, coupled with Mr. Licatese's testimony that Blossom can calculate the monetary damages of the termination of Rebekah quite accurately, provides apparently reasonable grounds for the trial court's determination that monetary damages could adequately compensate Blossom in the event that a jury finds that the Raysors acted in violation of their contractual duties. As such, Blossom's fourth issue merits no relief.

In its fifth and sixth issues, Blossom challenges the trial court's contempt rulings. Preliminarily, we must determine whether we have jurisdiction to address these issues. This Court has jurisdiction of "all appeals from **final** orders of the courts of common pleas . . .." 42 Pa.C.S.A. § 742 (emphasis added). With regard to civil contempt, "for a contempt order to be properly appealable, it is only necessary that the order impose sanctions on the alleged contemnor, and no further court order be required before the sanctions take effect." ***Rhoades v. Pryce***, 874 A.2d 148, 151 (Pa. Super. 2005) *(en banc)*; ***see also Foulk v. Foulk***, 789 A.2d 254, 258 (Pa. Super. 2001) *(en banc)*. Thus, civil contempt orders imposing sanctions generally constitute final, appealable orders. **See *Rhoades***, ***supra***; ***see also Lachat v. Hinchliffe***, 769 A.2d 481, 488 (Pa. Super. 2001) (stating civil contempt paired with sanctions constitutes final, appealable order); ***Diamond v. Diamond***, 792 A.2d 597 (Pa. Super. 2002) (stating contempt order with sanctions is final and appealable).

Conversely, a civil contempt order which does ***not*** impose sanctions is generally not a final appealable order. ***See K.M.G. v. H.M.W.***, 171 A.3d 839, 842 (Pa. Super. 2017) (observing that, "[i]n most of the cases, it is clear that either the order did not make a present finding of contempt, or revealed that the trial court contemplated further proceedings, thereby failing to meet the finality requirement of disposing of all claims and all parties); ***see also Sargent v. Sargent***, 733 A.2d 640, 641 (Pa. Super. 1999) (holding that "[u]ntil sanctions or imprisonment are actually imposed, an order declaring a party in contempt is interlocutory and not appealable"); ***Hester v. Bagnato***, 437 A.2d 66, 67 (Pa. Super. 1981) (observing that "[i]t is clear that, unless sanctions are imposed, an order declaring a party in contempt is interlocutory").

Here, as explained above, no final order has been entered in this matter. Moreover, as the subject contempt ruling imposed no sanctions, and it is clear that the trial court contemplated further proceedings in this action, we conclude that the portion of the trial court's March 28, 2025 order providing its contempt rulings constitutes an interlocutory order over which we have no jurisdiction. Thus, we may not address Blossom's final two issues.

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>01/14/2026</u>